# Illinois Official Reports

## Appellate Court

---

**Gillespie Community Unit School District No. 7, Macoupin County, Illinois v. Union Pacific R.R. Co.**, 2015 IL App (4th) 140877

---

| | |
|---|---|
| Appellate Court Caption | GILLESPIE COMMUNITY UNIT SCHOOL DISTRICT NO. 7, MACOUPIN COUNTY, ILLINOIS; and THE BOARD OF EDUCATION OF THE GILLESPIE COMMUNITY UNIT SCHOOL DISTRICT NO. 7, MACOUPIN COUNTY, ILLINOIS, Plaintiffs-Appellees and Cross-Appellants, v. UNION PACIFIC RAILROAD COMPANY, Defendant-Appellant and Cross-Appellee (Illinois Mine Subsidence Insurance Fund, Intervenor-Appellee and Cross-Appellant). |
| District & No. | Fourth District<br>Docket No. 4-14-0877 |
| Filed<br>Modified upon<br>denial of rehearing | November 6, 2015<br><br>December 30, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Macoupin County, No. 09-L-22; the Hon. Patrick J. Londrigan, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Timothy G. O'Connell, Dan H. Ball, Eric D. Martin, and John Michael Clear, all of Bryan Cave LLP, of St. Louis, Missouri, and Barry Levenstam (argued) and Michael A. Scodro, both of Jenner & Block LLP, of Chicago, for appellant. |

Rick Verticchio and Gina Verticchio, both of Verticchio & Verticchio, of Gillespie, and Thomas J. Verticchio (argued) and Matthew T. Kinst, both of Swanson, Martin & Bell, LLP, of Chicago, for appellee Gillespie Community Unit School District No. 7, Macoupin County, Illinois.

James E. Betke, of James E. Betke, P.C., of Oak Park, for appellee Illinois Mine Subsidence Insurance Fund.

Panel                      JUSTICE APPLETON delivered the judgment of the court, with opinion.
Presiding Justice Knecht and Justice Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1       There are three plaintiffs in this case. The first two plaintiffs are Gillespie Community Unit School District No. 7 and its board of education, and we will refer to those two plaintiffs, collectively, as "the School District." The third plaintiff is the Illinois Mine Subsidence Insurance Fund (Fund). The defendant is Union Pacific Railroad Company (Union Pacific).

¶ 2       Plaintiffs brought this action to recover damages from Union Pacific for a coal mine subsidence, which happened in Benld in March 2009 and which destroyed an elementary school and damaged a house. The school belonged to the School District. The house belonged to William and Jennifer Carter. The Carters are not parties to this case, but the Fund is a reinsurer of their house, and it also is a reinsurer of the school.

¶ 3       The Fund seeks from Union Pacific the amounts it paid as a reinsurer, and the School District seeks to be compensated for the destruction of its school and the damage to its land.

¶ 4       Union Pacific protests, however, that it did not dig the coal mine. Rather, Superior Coal Company (Superior Coal) did so long ago. Even so, plaintiffs seek to hold Union Pacific liable on the theory that in 1956 Chicago and North Western Railway Company (Chicago and North Western) assumed Superior Coal's liability for subsidences or, alternatively, on the theory that Superior Coal was, all along, Chicago and North Western's mere instrumentality or alter ego. The School District also alleges that Chicago and North Western directly participated in Superior Coal's mining activities. It appears to be undisputed that if any of those theories holds true, the liability ultimately got passed along, by merger, to Union Pacific.

¶ 5       In the trial court's view, the alleged facts failed to support any of those theories, and the court granted Union Pacific's motion to dismiss the complaints, with prejudice, for failure to state a cause of action (735 ILCS 5/2-615 (West 2010)). Plaintiffs appealed. We upheld the dismissal of some counts and reversed the dismissal of other counts. *Gillespie Community*

*Unit School District No. 7 v. Union Pacific R.R. Co.*, 2012 IL App (4th) 110142-U, ¶ 147. We could not say it was *clear*, on the face of the complaints, that no set of facts could be proved that would entitle plaintiffs to recover on the counts alleging assumption of liability, direct participation, and alter ego. *Id.* Looking at those counts in the light most favorable to plaintiffs, we decided to remand the case for further proceedings. *Id.*

¶ 6       On remand, the parties filed cross-motions for summary judgment. In the hearing on these motions, the trial court understood our discussion of plaintiffs' theory of assumption of liability as leaving the court no choice but to enter a summary judgment in plaintiffs' favor on that theory and to award them $9.85 million in damages, although the court made a summary determination in Union Pacific's favor on the remaining theories of direct participation and alter ego (which could not logically coexist with a theory of assumption of liability).

¶ 7       Actually, our preceding decision left some room for proof on the question of assumption of liabilities: we observed that the term "liabilities" in Chicago and North Western's resolution of 1956 could mean perfected liabilities, contingent liabilities, or both. *Id.* ¶ 82. On remand, Union Pacific presented extrinsic evidence that by assuming Superior Coal's "liabilities," Chicago and North Western intended to assume only perfected liabilities, liabilities that accrued before Superior Coal's dissolution–not unaccrued, unknowable, contingent liabilities, such as liabilities for subsidences occurring after dissolution. Because the record appears to contain no evidence contradicting Union Pacific's evidence in that respect, we conclude, *de novo*, that Union Pacific eliminated any genuine issue as to the meaning of "liabilities" in Chicago and North Western's resolution of 1956, and consequently we reverse the summary judgment in plaintiffs' favor. Chicago and North Western never assumed liability for future subsidences, that is, subsidences occurring after the dissolution of its subsidiary, Superior Coal.

¶ 8       That does not mean the case is over. Both plaintiffs and Union Pacific are only partly right in their cross-motions for summary judgment, and we only partly agree with their cross-appeals. Plaintiffs are entitled to a summary determination in their favor on Union Pacific's third, sixth, and ninth affirmative defenses, as the trial court correctly concluded. Union Pacific is entitled to a summary determination in its favor on the theory of assumption of liability, and thus there is no occasion to reform Chicago and North Western's resolution, as Union Pacific proposes to do. Union Pacific also is entitled to a summary determination on the theory of direct participation. But there still is a genuine issue of material fact as to plaintiffs' alter ego theory. With that theory still at issue, it would be premature to address the School District's remaining contention that it was entitled to prove the cost of grouting (filling the mine rooms with concrete). See *Pielet v. Pielet*, 2012 IL 112064, ¶ 57; *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 228 (1989); *In re Marriage of Osborn*, 206 Ill. App. 3d 588, 600 (1990).

¶ 9       Because there still is a genuine issue as to whether Superior Coal was the alter ego or instrumentality of Chicago and North Western, we reverse the summary judgment in plaintiffs' favor, and we remand this case for further proceedings.

¶ 10      We now will explain, in greater detail, how we arrived at this decision, beginning with the evidence in the summary judgment proceedings.

## I. BACKGROUND

### A. The Origin of Superior Coal

From about 1935 to 1947, Superior Coal was in litigation with the Illinois Department of Finance (Department). The Department claimed that Superior Coal owed a retailers' occupation tax in the total amount of $97,838 for coal Superior Coal had sold to its parent corporation, Chicago and North Western, from July 1933 to May 1935. Superior Coal contested this claim for back taxes because Superior Coal regarded itself as a department of Chicago and North Western, rather than a *bona fide* separate corporation, and the purported sales as intracorporate transfers for cost.

Much of our information about the relationship between those two companies in the early decades of the 20th century comes from documents filed in that litigation, both in the Department and in the supreme court. (None of the briefs disputes the admissibility of these or any other documents produced in discovery. In fact, there was a stipulation to admissibility.)

The richest source of information about the origin of Superior Coal is a document that Superior Coal filed with the Department on August 6, 1935: "Summary of History of the Superior Coal Company and Its Relationship With the Chicago and North Western Railway Company." According to this "Summary," Chicago and North Western came up with a plan, around 1900, to acquire coal more cheaply–coal that it needed to power its steam locomotives. Hitherto, when buying coal on the market, Chicago and North Western had to pay not only the seller's price, which, of course, was set high enough to fetch the seller a profit, but also freight charges to transport the coal via foreign rails to Chicago and North Western's own lines. This was expensive.

The first step Chicago and North Western took to free itself from its costly dependence on commercial coal suppliers and other railroads was to buy 25,000 acres of coal lands in Macoupin County. It then extended its lines to these coal lands.

The next step, in 1903, was to form a subsidiary, Superior Coal, and to convey the coal lands to it. Initially, Chicago and North Western capitalized Superior Coal in the amount of $1.5 million. Later, it increased the capitalization to $2 million, represented by 20,000 shares. Chicago and North Western owned 19,995 of these shares, and the directors of Superior Coal owned the remaining 5 shares, 1 apiece, as a condition of being qualified to serve as directors of Superior Coal. (In 1903, Illinois statutory law required that the directors be "*bona fide* shareholders in such association." 1903 Ill. Laws 125.)

All 20,000 of these shares were voting shares. One share equaled one vote. Thus, for instance, in a special meeting of Superior Coal's stockholders on July 14, 1947, a total of 20,000 votes were cast on the question of whether Nye F. Morehouse and Arthur R. Seder should be elected directors of Superior Coal. The decision was unanimous. Chicago and North Western, by a proxy, Barret Conway, cast 19,995 votes in favor of Morehouse and Seder, and the 5 directors of Superior Coal cast the remaining 5 favorable votes.

If ever, in the history of Superior Coal, there was a dissenting vote in any meeting of its shareholders and board of directors, we have not found one in the minutes in the record. It appears that the five directors of Superior Coal always voted with the majority shareholder, Chicago and North Western. In fact, Superior Coal publicly stated that its directors held their shares for the benefit of Chicago and North Western–although, presumably, the purpose of

requiring directors to be "*bona fide* shareholders" was to align their interests with the company they managed and cause them to be independent from outside influences. *Id.* In an "Additional Abstract of Record" in *Superior Coal Co. v. Department of Finance*, 377 Ill. 282 (1941) (*Superior Coal I*), filed in April 1941, Superior Coal's attorney, Nelson Trottman, represented to the supreme court: "These five director's qualifying shares are held for [Chicago and North Western]."

¶ 20                                    B. Common Officers and Directors

¶ 21    Superior Coal informed the Department that, since 1903, every director of Superior Coal had been simultaneously an officer or employee of Chicago and Northwestern. Likewise, the officers of Superior Coal, with one exception, were simultaneously officers of Chicago and North Western, usually in a corresponding position. The president of Superior Coal was Fred S. Pfahler, who also was the coal traffic manager of Chicago and North Western.

¶ 22                                    C. Selling Coal to the Parent at Cost

¶ 23    According to Pfahler's testimony in the tax case, the routine was for Chicago and North Western's general manager to send a memorandum each week to Superior Coal's purchasing agent, designating the amount of coal to be mined and loaded for the next week. At the end of the month, tonnage statements would be prepared, and using these tonnage statements, Pfahler would " 'figure out what cash' " Superior Coal would " 'need to meet [its] current bills,' " that is, " 'the cost of operating.' " Having made his calculations, Pfahler then would write the purchasing agent, stating that Superior Coal would " 'need so much per ton' ": a figure that " '[did] not represent anything beyond cost.' " Paying no more than cost, Chicago and North Western consumed all of Superior Coal's production (except that Superior Coal sold trivial amounts of coal to its employees).

¶ 24    It appears that, at least from the early 1930s onward, Superior Coal charged Chicago and North Western, its sole customer, only the cost of production. We are unclear exactly how far back in time that cost-only policy went. Even from July 1932 to December 1934, when Superior Coal was charging Chicago and North Western 20 cents per ton in excess of Superior Coal's cost of production, it still was charging, effectively, only the cost of production, because by prior agreement Superior Coal turned around and paid the excess to Chicago and North Western's creditor, the Reconstruction Finance Corporation, as assigned dividends. In December 1934, Superior Coal resumed charging Superior Coal only the cost of production.

¶ 25    The contract of December 27, 1934, recited: "[F]or many years [Superior Coal] has, although constituting a separate corporation, been managed and operated, and its properties managed and operated, as a branch or department of [Chicago and North Western], and wholly in its interest ***."

¶ 26    Superior Coal told the supreme court the same thing in the tax case, *Superior Coal I*. The additional abstract of the record in that case states: "At all times since its organization, the Superior Coal Company has been under the complete domination and control of [Chicago and North Western] as a mere branch or department of [Chicago and North Western's] business." As summarized in the supreme court's decision, Superior Coal's position was as follows:

"[Superior Coal] maintains that it is, in fact, but a department or branch of the railway company [(*i.e.*, Chicago and North Western)]; that it is merely an agent or instrumentality of the parent corporation; that coal mined by the plaintiff for use in the railway company's business is, in reality, mined by the railway company itself, and that the transactions in question between the plaintiff and its parent are no more 'sales' than would be any interdepartmental transfer, or the direct mining by the railway company of coal for its own use through an agent, under any circumstances to which the law of agency is applicable." *Id.* at 283-84.

¶ 27                          D. Pledging Collateral for the Parent's Loan

¶ 28    In 1934, Chicago and North Western needed to borrow money from banks in New York City. The banks required collateral, and Chicago and North Western turned to its subsidiary, Superior Coal.

¶ 29    According to a resolution of Superior Coal's directors, dated March 16, 1934, Chicago and North Western had requested Superior Coal to pledge some bonds as collateral. These were in fact some bonds of Chicago and North Western in which Superior Coal had invested. By resolution of the directors of Superior Coal, the bonds were turned over to the banks to secure Chicago and North Western's loan. The consideration, if any, for Superior Coal is unclear.

¶ 30    Afterward, the loan was repaid, and the collateral was returned.

¶ 31                                       E. Dividends

¶ 32    From 1911 to 1952, Superior Coal paid a total of $14.725 million in dividends to Chicago and North Western. The dividends for the years 1932, 1933, and 1934 ($100,000 and $400,000 and $300,000, respectively), resulting from temporarily charging Chicago and North Western 20 cents a ton above the cost of production, were assigned to the Reconstruction Finance Corporation pursuant to the contract of July 22, 1932, to pay off Chicago and North Western's loan.

¶ 33    From 1948 to 1952, Superior Coal's total net income was $1,245,318, but it declared a total of $1.850 million in dividends during that period.

¶ 34                     F. Depressed Conditions in the Coal Mining Industry
                                in the Late 1940s and Early 1950s

¶ 35    Throughout Superior Coal's existence, until about 1947, Chicago and North Western consumed its entire coal production. Beginning in 1947, Superior Coal began selling a portion of its production commercially. Because the demand for Illinois coal was declining, these commercial sales went from a high of 463,000 tons in 1947 to 86,000 tons in 1952.

¶ 36    In the 1950s, when Chicago and North Western was switching to diesel engines, it began contemplating the dissolution of Superior Coal and the sale of its physical assets for salvage.

¶ 37    On May 24, 1954, in a special meeting, Superior Coal's stockholders unanimously passed a resolution, which stated: "[I]t appears from reports presently before the stockholders that the continuation of coal production by the Superior Coal Company cannot be carried on profitably for the future and the Chicago and North Western Railway System's greatly

reduced requirements for coal may be obtained more reasonably from other sources." Therefore, the stockholders "authorized and directed" the board of directors and president of Superior Coal to "take appropriate action to discontinue active mining operations \*\*\* and carry out a program for the permanent closing and abandonment of mine Nos. 3 and 4, and the orderly salvaging and disposition of materials and equipment thereof."

¶ 38    Four days later, the directors of Superior Coal passed a resolution putting Pfahler in charge of the salvaging operations.

¶ 39                    G. Subsidence Claims During the Two Years
                        Preceding Superior Coal's Dissolution

¶ 40    On April 4, 1956, in a meeting of Superior Coal's directors, the topic of subsidence claims came up. The minutes of the meeting stated as follows:

> "Mr. Kiss reported that a new surface subsidence occurred at about 5:30 a.m. on Sunday, April 1, 1956, in a limited area in the southerly outskirts of Gillespie, in the area of operations of Mine 3. This subsidence brought probable damage to three houses, one of which is a farm house, and settling of about six acres of farm land.

> General discussion was had with respect to the Company's current situation in the matter of subsidence claims and the procedures involved in the processing of such claims. Mr. Kiss stated that there were 45 claims as a result of the October 1955 subsidence, that 4 of these claims have been paid and 4 more are about ready for settlement. Based on the Company's past experience in the settlement of subsidence claims he estimated the probable cost to the Company to dispose of all presently known claims and possible claims not yet made for repair of sewers, gas and water lines at $140,000.

> * * *

> In the view of Mr. Kiss's estimate of $140,000 as to present liability for subsidence damage and the Company's past experience, it was agreed that the Company's Surface and Subsidence Reserve in the amount of $172,926, as of December 31, 1955, is apparently adequate and not in need of any adjustment at this time."

¶ 41    On August 28, 1956, the topic of subsidences came up again, in a memorandum that Lowell Hastings, vice president and general counsel of Chicago and North Western, wrote the chairman of the company, Ben W. Heineman. The purpose of the memorandum was to "recommend that the Superior Coal Company be dissolved, that its assets be transferred to the Chicago and North Western Railway Company and that the Railway Company assume such of its liabilities as cannot be fully liquidated prior to such dissolution." Lowell did not believe that subsidence liabilities would be too great compared to Superior Coal's assets.

¶ 42    The memorandum said: "In this connection we have not overlooked the problems with respect to subsidence claims. In recent years there have been a number of such claims, all of which have either been paid or provided for by a reserve which appears to be adequate. Although the possibility of further subsidences will continue to exist, we have been advised by Mr. Pfahler, former President of the Coal Company, who, of course, is very familiar with the properties, that there is no reason to anticipate further difficulty except to a limited extent

adjacent to the present subsidences." How "adjacent," the memorandum did not specify.

¶ 43                     H. The Resolution to Dissolve Superior Coal

¶ 44     On September 14, 1956, the board of directors of Chicago and North Western passed a resolution that Superior Coal be dissolved. The resolution stated as follows:

"WHEREAS, this Company has adopted a policy of reducing the number of its subsidiary corporations, and in furtherance of that policy it has been determined to be in the best interest of this Company that the Superior Coal Company (all of whose outstanding shares are owned by this Company) be dissolved, that its assets be transferred to this Company, and that this Company assume its liabilities (in the event that such liabilities cannot be fully liquidated prior to the time a certificate of dissolution has been issued by the Secretary of State of Illinois);

* * *

FURTHER RESOLVED, that this Company assume any liabilities of the Superior Coal Company (subject to applicable Statutes of Limitations) that cannot be fully liquidated prior to the time a certificate of dissolution has been issued by the Secretary of State of Illinois."

¶ 45     Thus, by the terms of the resolution, Chicago and North Western was to acquire all of Superior Coal's assets and also was to assume all of Superior Coal's liabilities that remained unliquidated at the time of dissolution, provided that judicial enforcement of the liabilities was not barred by any statute of limitations.

¶ 46     On October 12, 1956, pursuant to section 75 of The Business Corporation Act (Ill. Rev. Stat. 1955, ch. 32, ¶ 157.75), the shareholders of Superior Coal executed a statement of intent to dissolve the corporation.

¶ 47     On December 28, 1956, Superior Coal quitclaimed to Chicago and North Western all its mineral rights in Macoupin County, including the No. 2 mine.

¶ 48     According to a general journal entry of Chicago and North Western for December 1956, Superior Coal's subsidence reserve of $124,834.60 likewise was transferred to Chicago and North Western or to its books.

¶ 49     In February 1957, Superior Coal was dissolved. It was solvent at the time, as far as Chicago and North Western could tell. Solvency meant that Superior Coal had enough assets to pay its known liabilities. Trottman had written about six months earlier, in a memorandum:

"Because of the nature of the liabilities of the Superior Coal Company, it is impossible to finally liquidate all such liabilities in the immediate future. The liabilities include pension obligations to pensioned former employees, and subsidence claims. The pension liabilities have been actuarially computed and the subsidence claims estimated, and the amounts thereof placed upon the balance sheet. The present balance sheet shows a solvent condition. Accordingly, if the North Western were to assume the Superior Coal Company's liabilities upon receiving its assets in liquidation, it would appear that such assets would be more than sufficient to take care of future liabilities. Conceivably, however, there might be potential but unknown liabilities of the Coal Company (e.g., unknown subsidence claims, or unknown and

unasserted but potential federal tax deficiencies), which in the aggregate might, when added to the known liabilities, exceed the assets to be distributed in liquidation."

The memorandum added, in a footnote: "The balance sheet as of July 31, 1956[,] shows, under 'Unadjusted credits,' a 'Pension reserve' in the amount of $425,679, a 'Personal injury reserve' in the amount of $51,435, and a 'Surface land subsidence reserve' of $154,874."

¶ 50                            I. The Succession of Ownership
                                 From Chicago and North Western
                                    to Union Pacific

¶ 51    In 1970, Chicago and North Western sold its assets to the newly formed North Western Employees Transportation Corporation, which agreed to assume "liabilities *** of any kind, nature and description, whether public or private, whether arising by or as a result of agreement, action, omission to act, law or violation of law, or otherwise, whether known or unknown, whether accrued or not accrued for any purpose, and whether or not disclosed by this Agreement or reflected in any book or record of any [*sic*] [Chicago and North Western]."

¶ 52    In 1972, North Western Employees Transportation Corporation changed its name to Chicago and North Western Transportation Company. The company afterward changed its name to Chicago and North Western Railway Company. (For the sake of simplicity, we will refer to both North Western Employees Transportation Corporation and Chicago and North Western Transportation Company as "New Chicago and North Western.")

¶ 53    In 1995, New Chicago and North Western merged into Union Pacific, and Union Pacific was the surviving entity.

¶ 54                          J. Notice of the Risk of Mine Subsidence
                         at the Proposed Site of a New Elementary School
                       and the Expense and Uncertainty of Assessing That Risk

¶ 55    The School District operates schools in two small cities, located three miles apart, Gillespie and Benld. The elementary school in Benld was a brick building, built in the 1920s. It was outdated and in need of tuckpointing, and the citizens of Benld wanted to replace it with a new elementary school. They wanted the new school to be in Benld since both the middle school and the high school were in Gillespie.

¶ 56    The problem was that Superior Coal had pretty much honeycombed the ground under Benld (and, for that matter, the ground under Gillespie). Subsidences were occurring right across the street from the site in Benld where the School District proposed building the new elementary school. Union Pacific's own tracks in Sawyerville, less than a mile from Benld, had sustained damage from a subsidence in 1998, as reported in *Gillespie Area News*. Indeed, the whole school district was undermined. In a board of education meeting in December 1998, Jerry Schaefer, a geotechnician, "distributed a map of the school district showing that virtually all of the available sites [had] been undermined." (We are quoting from Union Pacific's exhibit No. 168: *Area Coal Mining Heritage May Hamper Site Selection for New School*, Gillespie Area News, Dec. 10, 1988, at 1.) Timothy McMinn, a principal in the FGM architectural firm, commented: "One of the problems with building on land prone to subsidence *** is that the specialized construction needed to establish a solid foundation can

eat up dollars, reducing the amount of money the district can spend on actual classroom space." *Id.* at 11.

¶ 57    The School District hired an architectural firm, Wight & Company (Wight), which in turn hired Hanson Engineers (Hanson), to write a foundation engineering report. In 1999, Hanson wrote its report, which Wight passed on to the School District. The report said, under the heading "Risk of Coal Mine Subsidence":

> "Due to the many unknown variables involved in predicting both the chance of subsidence and its possible magnitude, it is nearly impossible to quantify the risk involved in building on an undermined site. Surface investigations undertaken to predict the possibility of future subsurface [subsidence] are always very expensive and are generally inconclusive. The owner should consider the fact that there is no economically feasible corrective action that can be taken to guarantee against future subsidence.
>
> The risk of future subsidence must be valued along with the other features of the site with the knowledge that it will not be possible to completely avoid similar risks in the area closely surrounding Benld, Illinois."

¶ 58    In a couple of places in the record, there is mention that exploratory core-drilling to a depth of 300 feet, where the coal mines were, would have cost $200,000 and would have yielded no guarantees.

¶ 59    Wight did some relatively shallow drilling to assess the foundational adequacy of the surface, but this drilling could reveal nothing about the support hundreds of feet down.

¶ 60                    K. What the School District Should Have Done,
                         According to Union Pacific's Expert

¶ 61    Union Pacific presented an affidavit by David Newman, a mining engineer with expertise in mine roof stability. He stated that the primary mining method used in the school district was room-and-pillar mining. The barrier pillars in Superior Coal's mines were located approximately 330 yards apart, and in his opinion, the risk of subsidence damage would have been reduced if, in 2002, the school had been built over or in close proximity to barrier pillars and if, in addition, the surface had been reinforced with underground grouting.

¶ 62    In his affidavit, Newman did not venture an estimate of how much these measures would have cost, but he said: "If grouting the mine had been used when building a two-story school with the same square footage as the 2002 School, and the school had been built in proximity to the existing barrier pillars, the cost of grouting would have been reduced by more than 50%. The cost of grouting would have been further reduced if [the] column grouting method were feasible and used at this site instead of saturation grouting."

¶ 63    In sum, Newman blamed the School District for failing to hire professionals with sufficient expertise and for failing, with the help of such professionals, to "evaluate the history of subsidence in the vicinity of the site, the geometry and characteristics of mining underneath the proposed site, the feasibility of alternative sites, and the cost and feasibility of grouting or other measures to mitigate the risk, such as moving the location or modifying the configuration of the building."

¶ 64　　　　　　　　L. The Construction of the Elementary School in Benld

and the Destruction of the School by Mine Subsidence

¶ 65　　In 2001, the School District entered into agreements for the construction of the elementary school in Benld over Superior Coal's abandoned No. 2 mine. The school was constructed at a cost of $9 million in public funds, and it opened in August 2002.

¶ 66　　In March 2009, 6½ years later, the ground beneath the school subsided, inflicting structural damage to the school. Within a few weeks, the Illinois State Board of Education determined that the damage was so severe that the school had to be condemned and demolished.

¶ 67　　　　　　　　　　　　　II. ANALYSIS

¶ 68　　　　　　　　　　　A. Assumption of "Liabilities"

¶ 69　　When mining coal in Macoupin County from 1903 to about the mid-1950s, Superior Coal had an obligation to leave enough subjacent support, *i.e.*, underground pillars, so that the ground surface, in its natural state, would not subside. See *Wilms v. Jess*, 94 Ill. 464, 467 (1880); Restatement (Second) of Torts § 820(1), at 78 (1979); 9 Richard R. Powell, Powell on Real Property § 63.06(1), at 63-28 to 63-29 (Michael Allan Wolf ed., 2000). A cause of action for breach of that obligation would accrue when the land subsided (*Treece v. Southern Gem Coal Corp.*, 245 Ill. App. 113, 118 (1923); Restatement (Second) of Torts § 820 cmt. g, at 80 (1979))–which, of course, could be a long time after the removal of the subjacent support and a long time after Superior Coal ceased to exist.

¶ 70　　In 1957, Superior Coal was dissolved. A few months before its dissolution, Superior Coal quitclaimed to Chicago and North Western all its mineral rights in Macoupin County. (Chicago and North Western always had owned all of Superior Coal's stock except for five shares, which the directors of Superior Coal owned in order to be qualified to serve as directors of that company.)

¶ 71　　Despite its acquisition of Superior Coal's assets, Chicago and North Western was not liable for Superior Coal's obligations unless Chicago and North Western expressly or impliedly agreed to assume them (see *Alexander v. State Savings Bank & Trust Co.*, 281 Ill. App. 88, 96 (1935)) or unless Superior Coal was, all along, Chicago and North Western's alter ego, a question we will discuss in a moment. The parties in this appeal do not appear to dispute that in its resolution of September 14, 1956, Chicago and North Western agreed to assume "any liabilities" of Superior Coal. Union Pacific disputes, however, that, by this resolution, Chicago and North Western agreed to assume *perpetual* liability for any *future* subsidences over Superior Coal's mines. Instead, according to Union Pacific, when the resolution is reasonably interpreted, Chicago and North Western agreed to assume liability for subsidences only insomuch as actions for such subsidences were allowable under any "applicable Statutes of Limitations": a term Union Pacific regards as including section 94 of The Business Corporation Act (Ill. Rev. Stat. 1955, ch. 32, ¶ 157.94), otherwise known as the "corporate survival statute," a statute that extended the life of a dissolved corporation for two years to enable it to sue or be sued during that two-year grace period.

¶ 72　　Before discussing whether the phrase that Chicago and North Western used in its resolution, "applicable Statutes of Limitations," actually applies to the corporate survival statute, we should do two things. First, we should explain why the parties care whether

Chicago and North Western agreed to assume perpetual liability for future subsidences over Superior Coal's mines. Second, we should state the conclusions of fact and law that appear to be undisputed with respect to plaintiffs' theory of assumption of liability.

¶ 73                                          1. *Why the Parties Care*

¶ 74    Why do the parties care whether, more than half a century ago, a now defunct corporation, Chicago and North Western, agreed to assume liability for future subsidences over Superior Coal's mines? The reason is this. It apparently is undisputed that if indeed Chicago and North Western agreed to assume Superior Coal's liability for future subsidences, that liability gets passed along ultimately to the final successive owner of Chicago and North Western: Union Pacific.

¶ 75    Again, the succession of ownership from Chicago and North Western to Union Pacific was as follows. In 1970, Chicago and North Western sold its assets to New Chicago and North Western, which assumed Chicago and North Western's "liabilities *** of any kind, nature and description, whether public or private, whether arising by or as a result of agreement, action, omission to act, law or violation of law, or otherwise, whether known or unknown, whether accrued or not accrued for any purpose, and whether or not disclosed by this Agreement or reflected in any book or record of any [*sic*] [Chicago and North Western]." New Chicago and North Western changed its name a couple of times. Then, in 1995, New Chicago and North Western merged into Union Pacific, and Union Pacific was the surviving entity.

¶ 76    The parties apparently do not dispute that the language whereby New Chicago and North Western assumed Chicago and North Western's liabilities ("liabilities *** of any kind *** whether known or unknown, whether accrued or unaccrued") was broad enough to assume any "unknown" and "unaccrued" liability for future subsidences that Chicago and North Western had assumed from Superior Coal–if indeed Chicago and North Western had assumed such liability from Superior Coal, which precisely is the question. After the merger, the absorbing corporation, Union Pacific, was responsible for any liabilities of the absorbed corporation, New Chicago and North Western. See *Plaza Express Co. v. Middle States Motor Freight, Inc.*, 40 Ill. App. 2d 117, 124 (1963).

¶ 77    In short, when New Chicago and North Western merged into Union Pacific, Union Pacific absorbed the liabilities of New Chicago and North Western. Whether those liabilities included liability for future subsidences depends on whether, in the first place, Chicago and North Western agreed to assume that liability from Superior Coal (or whether, alternatively, Superior Coal was Chicago and North Western's instrumentality or alter ego under a veil-piercing theory).

¶ 78                              2. *Conclusions That Appear to Be Undisputed*

¶ 79                    a. The Resolution Is an Agreement by Chicago and North Western
                                    to Assume Liabilities of Superior Coal

¶ 80    Again, the law was that if Company A acquired Company B's assets, Company A was liable for Company B's liabilities only if Company A "agree[d,] express[ly] or implied[ly]," to assume them. (Internal quotation marks omitted.) *Alexander*, 281 Ill. App. at 96. It

apparently is undisputed that the resolution of September 14, 1956, was an agreement by Chicago and North Western to assume liabilities of Superior Coal. *Id.* In its brief, Union Pacific refers to the resolution as a "contract," urging us to "read [it] as any other contract."

¶ 81                    b. Among the "Liabilities" That Chicago and North Western Assumed
Was Liability for Predissolution Subsidences

¶ 82    Before the Secretary of State would issue a certificate of dissolution for Superior Coal, he had to be convinced that "adequate provision" had been made for Superior Coal's "debts, liabilities, and obligations." Ill. Rev. Stat. 1955, ch. 32, ¶ 157.80. Presumably, that is why, in its resolution of September 14, 1956, Chicago and North Western decided to "assume any liabilities of the Superior Coal Company" after deciding, earlier in the resolution, to assume immediate ownership of Superior Coal's assets. If Chicago and North Western immediately assumed ownership of the assets out of which Superior Coal's debts, liabilities, and obligations would have been satisfied, Chicago and North Western likewise had to assume those debts, liabilities, and obligations.

¶ 83    Note, however, that to justify the immediate transfer of Superior Coal's assets to itself, Chicago and North Western had to assume only those debts, liabilities, and obligations of Superior Coal that accrued before Superior Coal's dissolution. The reason was this. The corporate survival statute (Ill. Rev. Stat. 1955, ch. 32, ¶ 157.94), in derogation of the common law, extended the life of a dissolved corporation for two years for the limited purpose of enabling the corporation to sue and be sued, during that period, *on claims that accrued before the dissolution*. Under the common law, the right to sue Superior Coal would have abated the moment Superior Coal was dissolved, but the corporate survival statute (*id.*) changed that by putting the dissolved corporation on artificial life support for two years, enabling it, during that period, to sue and be sued. See *Poliquin v. Sapp*, 72 Ill. App. 3d 477, 481 (1979); *Consolidated Coal Co. of St. Louis v. Flynn Coal Co.*, 274 Ill. App. 405 (1934). But the cause of action, either against or in favor of the dissolved corporation, had to accrue before the dissolution. The corporate survival statute provided:

"The dissolution of a corporation either (1) by the issuance of a certificate of dissolution by the Secretary of State, or (2) by the decree of a court of equity when the court has not liquidated the assets and business of the corporation, or (3) by expiration of its period of duration, shall not take away or impair any remedy available to or against such corporation, its directors, or shareholders, for any right or claim existing, or *any liability incurred, prior to such dissolution* if action or other proceeding thereon is commenced within two years after the date of such dissolution. Any such action or proceeding by or against the corporation may be prosecuted or defended by the corporation in its corporate name." (Emphasis added.) Ill. Rev. Stat. 1955, ch. 32, ¶ 157.94.

Thus, "any rights, claims, or liabilities preserved by [the corporate survival statute] still [had to] be raised in a cause of action that actually accrued predissolution." *A Plus Janitorial Co. v. Group Fox, Inc.*, 2013 IL App (1st) 120245, ¶ 21.

¶ 84    Again, a cause of action for the removal of naturally necessary subjacent support accrued not when the support was removed but when the land subsided. *Treece*, 245 Ill. App. at 118. Thus, despite the corporate survival statute, it would have been impossible to sue Superior

Coal for a subsidence that happened after dissolution. The common law was to that extent unmodified. It follows that, to justify the immediate transfer of Superior Coal's assets to itself, Chicago and North Western did not have to assume liability for any subsidences that would happen after dissolution.

¶ 85    It appears to be undisputed that, by its resolution of September 14, 1956, Chicago and North Western assumed liability for subsidence claims that accrued *before* the dissolution of Superior Coal, provided that (1) a complaint was filed within two years after the dissolution and (2) no statute of limitations barred the claim. Union Pacific admits as much when it argues in its brief: "The Evidence Shows That the [Chicago and North Western] Resolution Was Intended To Assume Liabilities Limited to Those Permitted by Section 94." But Union Pacific disputes that Chicago and North Western (unnecessarily and irrationally) assumed liability for future, postdissolution subsidences.

¶ 86                    3. *The Meaning of "Any Applicable Statutes of Limitations"*

¶ 87    In the resolution, Chicago and North Western "assume[d] any liabilities of the Superior Coal Company (*subject to applicable Statutes of Limitations*)." (Emphasis added.) On remand, in the summary judgment proceedings, Union Pacific presented extrinsic evidence that Chicago and North Western understood the words "applicable Statutes of Limitations" to include the corporate survival statute, section 94 of The Business Corporation Act (Ill. Rev. Stat. 1955, ch. 32, ¶ 157.94). Was such extrinsic evidence admissible? When deciding the meaning of "applicable Statutes of Limitations," should a court consider evidence outside the four corners of the resolution?

¶ 88    Union Pacific urges us to interpret the resolution as one would interpret any contract. There is a well-established rule of contractual interpretation called "the four corners rule." According to that rule, "[a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." (Internal quotation marks omitted.) *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999). Unless language in a contract is facially ambiguous, the four corners rule requires us to determine the parties' intention only from the language of the contract, without resorting to extrinsic evidence of intention. *Id.*

¶ 89    The supreme court has explained:

> "In applying [the four corners] rule, a court initially looks to the language of a contract alone. See *Rakowski v. Lucente*, 104 Ill. 2d 317, 323 (1984) (stating that both the meaning of a written agreement and the intent of the parties is to be gathered from the face of the document without assistance from extrinsic evidence). If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence. [Citation.] If, however, the trial court finds that the language of the contract is susceptible to more than one meaning, then an ambiguity is present. [Citation.] Only then may parol evidence be admitted to aid the trier of fact in resolving the ambiguity. [Citation.]" *Id.* at 462-63.

¶ 90    The four corners rule, so described, sounds a lot like the parol evidence rule. Justice Posner points out, however, that although the parol evidence rule "overlaps" the four corners rule, the two rules are "not identical." Richard A. Posner, *The Law and Economics of*

*Contract Interpretation*, 83 Tex. L. Rev. 1581, 1603 (2005). The four corners rule, he explains, is more restrictive than the parol evidence rule. While the parol evidence rule "forbids only the use of evidence of the precontractual negotiations to contradict the written contract," the four corners rule "goes further by prohibiting the use of extrinsic evidence to supplement rather than only to contradict the written contract." *Id.*

¶ 91 "Extrinsic evidence" is, quite simply, evidence outside the four corners of the contract. Evidence "regarding the position of the parties, the surrounding circumstances existing at the time of execution, and the parties' subsequent conduct" are all examples of extrinsic evidence. *Harris Trust & Savings Bank v. La Salle National Bank*, 208 Ill. App. 3d 447, 453 (1990). Such evidence is admissible only if "the language of the contract is facially unambiguous" (*Air Safety*, 185 Ill. 2d at 462), that is, only if "the language used is susceptible to more than one meaning [citation] or is obscure in meaning through indefiniteness of expression [citation]" (*Wald v. Chicago Shippers Ass'n*, 175 Ill. App. 3d 607, 617 (1988)).

¶ 92 It is true that in a case Union Pacific cites, *Batteast v. Wyeth Laboratories, Inc.*, 137 Ill. 2d 175, 182-83 (1990), the supreme court considered extrinsic evidence, "the circumstances," to determine the meaning the parties intended to give a contractual term, "release," without explicitly finding that term to be facially ambiguous. Afterward, however, in *Air Safety*, 185 Ill. 2d at 462, the supreme court reaffirmed its commitment to the four corners rule (which the supreme court never mentioned in *Batteast*). So, it appears that, currently the four corners rule is the law in Illinois. *In re Marriage of Lyman*, 2015 IL App (1st) 132832, ¶ 71. We are obliged to follow that rule.

¶ 93 The very first thing we must do, according to the four corners rule, is look at the language of the contract and decide whether it contains, on its face, any ambiguity. *Air Safety*, 185 Ill. 2d at 462. This is a question of law for the court. *Wald*, 175 Ill. App. 3d at 617. Looking only at the resolution and attributing to its words their plain and ordinary meaning (see *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 436 (2010); *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007)), we have to decide whether the term "Statutes of Limitations," in the parenthetical phrase "subject to applicable Statutes of Limitations," is facially ambiguous.

¶ 94 A dictionary is a good place in which to find the plain and ordinary meaning of words. *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352, 366 (2006); *West Bend Mutual Insurance Co. v. DJW-Ridgeway Building Consultants, Inc.*, 2015 IL App (2d) 140441, ¶ 37. Judging from a dictionary published in 1956, the year Chicago and North Western passed its resolution, the term "statute of limitations" was neither obscure nor "susceptible to more than one meaning." *Wald*, 175 Ill. App. 3d at 617. A "Statute of Limitations" is "[a] statute which imposes time limits upon the right of action in certain cases, as by obliging a creditor to demand payment of a debt within a specified time." Funk and Wagnalls New College Standard Dictionary 1142 (1956). This is the only definition the dictionary gives of "Statute of Limitations." It is not that there is more than one definition to choose from. Because the term in the resolution of September 14, 1956, "Statutes of Limitations" has an unambiguous meaning, extrinsic evidence is inadmissible to prove what Chicago and North Western meant by that term. See *Gallagher*, 226 Ill. 2d at 233; *Air Safety*, 185 Ill. 2d at 462-63.

¶ 95 We realize the parties disagree whether the corporate survival statute (Ill. Rev. Stat. 1955, ch. 32, ¶ 157.94) is a statute of limitations. Union Pacific insists it is a statute of limitations,

whereas plaintiffs insist it is not. But that really is not a dispute over the meaning of "statute of limitations," which is an unambiguous term. Instead, it is a dispute over whether the corporate survival statute conforms to the meaning of that unambiguous term. It is a dispute over the application of the resolution rather than its meaning. There is no doubt what "statute of limitations" means. The question is whether, from an objective point of view, the corporate survival statute fits the description of a "statute of limitations."

¶ 96     Objectively, the corporate survival statute, section 94 of The Business Corporation Act (*id.*), is not a "statute of limitations" in the plain and ordinary sense of that term, because instead of "impos[ing] time limits" on a preexisting "right of action" (Funk and Wagnalls New College Standard Dictionary 1142 (1956)), as a statute of limitations would do, section 94 *expands* the time within which to sue a corporation, by keeping the corporation alive for two years after the issuance of a certificate of dissolution. Granted, two years is a finite, or "limited," period of time, but if that were enough to make section 94 a statute of limitations, the only way section 94 could have avoided being a statute of limitations was by extending the life of a dissolved corporation forever. One cannot plausibly call the corporate survival statute a "statute of limitations" simply because the statute does not keep the dissolved corporation alive indefinitely.

¶ 97     Another reason why it would be implausible to call section 94 a "statute of limitations" is that section 94 surely is subject to actual statutes of limitation, such as the five-year statutory limitation applicable to actions for property damage (Ill. Rev. Stat. 1955, ch. 83, ¶ 16). See *Michigan Indiana Condominium Ass'n v. Michigan Place, LLC*, 2014 IL App (1st) 123764, ¶ 26 ("Compliance with an applicable statute of limitations is merely an additional requirement that must be met when bringing suit against a dissolved corporation within the time period contained in [the corporate survival statute]."). Even if a claim accrued before dissolution and the plaintiff filed suit within two years after dissolution, the five-year statute of limitations could nevertheless bar the claim. It would be strange if two different conflicting statutes of limitations applied to the same claim of property damage.

¶ 98     It is true that, in *Sarelas v. Fagerburg*, 316 Ill. App. 606, 616-17 (1942), the appellate court referred to the corporate survival statute as a "statute of limitations," but the issue in that appeal was not whether the corporate survival statute really was a statute of limitations, properly speaking. Besides, five years earlier, in the same case, the appellate court said: "[The corporate survival statute] is not strictly a statute of limitation but is a conditional limitation upon plaintiff's right of action." *Sarelas v. McCue & Co.*, 291 Ill. App. 540, 545 (1937) (citing *Dukes v. Harrison & Reidy*, 270 Ill. App. 372 (1933)).

¶ 99     In *Dukes*, a corporation was dissolved by judicial decree on September 17, 1928. *Dukes*, 270 Ill. App. at 374-75. The corporate survival statute preserved judicial remedies against a dissolved corporation " 'for any liabilities incurred previous to its dissolution,' " provided that " 'suit *** [was] brought and service of process had within two years after such dissolution.' " *Id.* at 375. On January 28, 1930, within the two-year period, the plaintiff sued the dissolved corporation, but on September 15, 1930, the circuit court dismissed her case for lack of prosecution. *Id.* She refiled her complaint on September 14, 1931 (*id.* at 373), and the corporation pleaded the expiration of the two-year period in the corporate survival statute (*id.* at 375). The plaintiff countered that, under section 26 of the Limitations Act, " 'if the time limited for bringing such action shall have expired during the pendency of such suit,' " she had one year after she was " 'nonsuited' " to refile her case. *Id.* at 377. The appellate court

was unconvinced. It held that, in section 26 of the Limitations Act, " 'the time limited for bringing such action' " had to be a time specified in a statute of limitations and that the corporate survival statute was " 'not a statute of limitations but [was] a condition of the liability itself.' " *Id.* at 380-81 (quoting *Bishop v. Chicago Rys. Co.*, 303 Ill. 273, 277 (1922)). Because the corporate survival statute was not a statute of limitations, section 26 had no effect on the corporate survival statute. *Id.* at 381.

¶ 100    The corporate survival statute does something fundamentally different from a statute of limitations. Whereas a statute of limitations imposes a time limit on a right of action the law already recognizes, the corporate survival statute creates a new, temporally limited right: the right to sue a dissolved corporation (see *Poliquin*, 72 Ill. App. 3d at 481). "[W]here the statute creates a right that did not exist at common law and restricts the time within which the right may be availed of, or otherwise imposes conditions, such statute is not a statute of limitation[,] but the time element is an integral part of the enactment." *Smith v. Toman*, 368 Ill. 414, 420 (1938).

¶ 101    So, in 1956, when Chicago and North Western passed its resolution, it was settled law in Illinois that the corporate survival statute was not a statute of limitations, and hence the phrase in the resolution "subject to applicable Statutes of Limitations" did not include the corporate survival statute. See *Ambarann Corp. v. Old Ben Coal Corp.*, 395 Ill. 154, 164 (1946); *Wilson v. Wilson*, 268 Ill. 270, 273 (1915).

¶ 102                              4. *"Any Liabilities of the Superior Coal Company"*

¶ 103    Chicago and North Western resolved to "assume any *liabilities* of the Superior Coal Company." (Emphasis added.) In our previous decision in this case, we observed that the word "liabilities" had an established legal meaning. *Gillespie Community Unit School District No. 7*, 2012 IL App (4th) 110142-U, ¶ 82. It meant " 'a legal obligation or responsibility enforceable by civil remedy or criminal punishment.' " *Id.* (quoting *Loman v. Freeman*, 229 Ill. 2d 104, 121 (2008)). We further observed, however, that this obligation or responsibility could be either perfected or contingent. *Id.* It could be the obligation to do something " 'at once' " or it could be the obligation to do something " 'at some future time,' " subject to the occurrence of conditions. *Id.* (quoting *White v. Green*, 74 N.W. 928, 929 (Iowa 1898)).

¶ 104    Thus, although "liability" means, in a general sense, an obligation or responsibility enforceable by law, the question remains as to whether this obligation or responsibility is perfected or contingent. See *Wald*, 175 Ill. App. 3d at 617. Extrinsic evidence is admissible to clear up that ambiguity. See *Gallagher*, 226 Ill. 2d at 233; *Air Safety*, 185 Ill. 2d at 462-63.

¶ 105    According to Union Pacific, the extrinsic evidence eliminates any genuine issue as to whether the word "liabilities" in the resolution of September 14, 1956, meant anything more than perfected liabilities, *e.g.*, liabilities for subsidences that already had happened, before the dissolution of Superior Coal. See 735 ILCS 5/2-1005(c) (West 2014) ("The judgment sought shall be rendered without delay if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."). Union Pacific's argument on the extrinsic evidence can be distilled to three points.

¶ 106    First, because section 157.79(b) of The Business Corporation Act (Ill. Rev. Stat. 1955, ch. 32, ¶ 157.79(b)) required a dissolving corporation to "pay[ ] or adequately provid[e] for

- 17 -

the payment of all its obligations" before "distribut[ing] the remainder of its assets *** among its shareholders" and because the corporate survival statute (Ill. Rev. Stat. 1955, ch. 32, ¶ 157.94) preserved only rights of action against the dissolved corporation that accrued before the issuance of the certificate of dissolution, it would have been unnecessary and irrational for the financially distressed parent corporation, Chicago and North Western, to assume any liabilities of its subsidiary, Superior Coal, other than those that accrued before the dissolution of Superior Coal.

¶ 107    Second, out of Superior Coal's assets, Chicago and North Western received a reserve of only $172,926 for subsidence claims. According to calculations by Superior Coal's officers, this was the approximate amount needed to cover the subsidences that already had happened, in 1955 and 1956, within a five-block area of Gillespie, insomuch as the claims had not yet been settled. The companies never set aside a reserve, and never attempted to calculate a reserve, for subsidences that had not yet happened.

¶ 108    Third, in its financial statements and other public disclosures, Chicago and North Western never mentioned it had assumed perpetual liability for future subsidences over Superior Coal's mines–which surely would have been a material fact for current shareholders or anyone thinking of investing in Chicago and North Western, considering that, for half a century, Superior Coal had been mining 29 square miles of land.

¶ 109    "Where extrinsic evidence is introduced to aid in the interpretation of uncertain or ambiguous contract language, the question of the meaning of the language generally is left to the jury. If, however, after taking into account the extrinsic evidence, the court determines that a reasonable person could reach only one conclusion, then the issue should be decided by the trial court." *Wald*, 175 Ill. App. 3d at 619. Given the extrinsic evidence, we are convinced that a reasonable person could reach only one conclusion: "liabilities" in the resolution of September 14, 1956, means only *positive* or *perfected* liabilities, such as liabilities for subsidences that happened before the dissolution of Superior Coal, and does not include *contingent* liability for subsidences that might happen after the dissolution. See *In re Marriage of Hahn*, 324 Ill. App. 3d 44, 47 (2001) ("When a term is susceptible to two different interpretations, the court must follow the interpretation that establishes a rational and probable agreement.").

¶ 110    We find further support for this conclusion in the text of the resolution itself. The resolution speaks of "liabilities" in the plural. According to dictionaries published in the 1930s, 1940s, and 1950s, the word "liabilities" in the plural, as opposed to "liability" in the singular, tends to mean *existing pecuniary* obligations–the opposite of "assets" in a balance sheet. Webster's New International Dictionary of the English Language 1242 (1933) ("2. *** in the *pl.*, one's pecuniary obligations, or debts, collectively–opposed to *assets*" (emphasis in original)); Webster's New International Dictionary of the English Language 1423 (2d ed. 1934) (same); Walter A. Shumaker & George F. Longsdorf, Cyclopedic Law Dictionary 660 (Frank D. Moore ed., 3d ed. 1940) ("All debts or obligations of a concern. The capital stock, funded or floating indebtedness, accounts payable, surplus, losses, etc.; are included in this term in a balance sheet, or statement of the condition of a business concern."); Funk and Wagnalls New College Standard Dictionary 687 (1956) ("3. That for which one is liable or responsible; specifically, in the plural, debts as opposed to *assets*." (Emphasis in original.)); 1 Webster's New Twentieth Century Dictionary of the English Language 1041-42 (2d ed. 1958) ("3. [*usually in pl.*] a debt; as, accounts payable, surplus, losses, and capital stock are

*liabilities* of a corporation: opposed to *asset*" (emphases in original)); see *Swiss Colony, Inc. v. Commissioner*, 52 T.C. 25, 31 (1969).

¶ 111    By contrast, "liability" in the singular tends to mean the "state" or "quality" of "being liable." Webster's New International Dictionary of the English Language 1242 (1933) ("1. State or quality of being liable; as, the *liability* of an insurer; *liability* to accidents; *liability* to the law." (Emphases in original.)); Funk and Wagnall's New College Standard Dictionary 687 (1956) ("1. The state of being liable, or exposed to some accidental or incidental result or occurrence; as *liability* to disease. 2. The condition of being responsible for a possible or actual loss, penalty, evil, expense, or burden; as, *liability* for damages." (Emphases in original.)); 1 Webster's New Twentieth Century Dictionary of the English Language 1041-42 (2d ed. 1958) ("1. The state of being liable. 2. anything for which a person is liable.").

¶ 112    When the resolution speaks of "liabilities *** that cannot be fully liquidated prior to the time a certificate of dissolution has been issued," the resolution does not mean *states* or *qualities* of being liable. Normally, one does not "liquidate" states or qualities of being liable. Rather, the resolution means existing pecuniary obligations: Superior Coal had existing financial obligations, but not all them had been paid or reduced to a specific dollar amount, *i.e.*, liquidated. Because contingent liability for subsidences that might happen in the future is not an existing pecuniary obligation, as signified by "liabilities," we conclude that Union Pacific was entitled to judgment as a matter of law on plaintiffs' theory of express assumption of liability.

¶ 113    In its petition for rehearing, the School District objects that, by that conclusion, we violate the law of the case by contradicting our previous decision, specifically, paragraph 83, in which we stated: "When Chicago and North Western assumed all of Superior Coal's liabilities, it assumed Superior Coal's liability to provide subjacent support. *That liability included the contingency that, decades in the future, the land might subside over Superior Coal's mines*." (Emphasis added.) *Gillespie*, 2012 IL App (4th) 110142-U, ¶ 83. When so stating, however, we were reviewing the dismissal of the plaintiffs' complaints for failure to state a cause of action, and we were obliged to interpret the complaints in the light most favorable to the plaintiffs. See *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 189 (1997); *Gillespie*, 2012 IL App (4th) 110142-U, ¶ 4. Interpreted in the light most favorable to plaintiffs, the resolution, quoted in their complaints, meant that Chicago and North Western had assumed not only Superior Coal's absolute or perfected liabilities but also, in perpetuity, its contingent liabilities. In the present case, by contrast, we are reviewing the trial court's rulings on cross-motions for summary judgment, and our scrutiny no longer is limited to the complaints (interpreted in the light most favorable to the plaintiffs) but broadens to evidence outside the complaint. See 735 ILCS 5/2-1115(c) (West 2014).

¶ 114    It is true, as the School District points out, that in our previous decision, we said that "[t]he word 'liabilities' had an established legal meaning," which was not limited to "a 'perfected or absolute liability.' " *Gillespie*, 2012 IL App (4th) 110142-U, ¶ 82. But we did not intend to suggest that in each particular instance in which the word "liabilities" was used, it invariably meant both absolute and contingent liabilities. As we demonstrated, for example, by a quotation from a supreme court case, the word " 'liability' " was " 'more frequently used' " in the sense of " 'contingency' "; " 'more frequently' " meant usually, but not always. (Internal quotation marks omitted.) *Id.* (quoting *Evans v. Illinois Surety Co.*, 298 Ill. 101, 113 (1921)). And we also quoted an Iowa case, stating: " 'Liability in a legal sense,

is the state or condition of one who is under obligation to do at once *or* at some future time something which may be enforced by action. It *may* exist without the right of immediate enforcement.' " (Emphases added.) *Id.* (quoting *White*, 74 N.W. at 929). So, even though "liability" had an unambiguous, well-established meaning of " 'a legal obligation or responsibility enforceable by civil remedy,' " that obligation or responsibility, as demonstrated by the quotations, could be absolute, or it could be contingent. *Id.* (quoting *Loman*, 229 Ill. 2d at 121). When, after quoting these cases, we stated that the assumed liability of Chicago and North Western "included the contingency that, decades in the future, the land might subside over Superior Coal's mines" (*id.* ¶ 83), we merely were interpreting the complaints in the light most favorable to the plaintiffs, as we said at the outset we would do (*id.* ¶ 4). We did not intend to slam the door on any summary judgment contention, backed up by evidence, the "liabilities" actually meant only absolute liabilities.

¶ 115                                    B. Direct Participation Liability

¶ 116       The School District argues that because there was evidence that "Chicago and North Western mandated an overall business strategy of its subsidiary," Superior Coal, the trial court erred by making a summary determination against the School District on its theory of direct participation liability. The School District quotes from *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 290 (2007): "[W]e hold that direct participant liability is a valid theory of recovery under Illinois law. Where there is evidence sufficient to prove that a parent company mandated an overall business and budgetary strategy *and* carried that strategy out by its own specific direction or authorization, surpassing the control exercised as a normal incident of ownership in disregard for the interests of the subsidiary, that parent company could face liability." (Emphasis in original.)

¶ 117       In *Forsythe*, however, there arguably was a causal nexus between the parentally mandated budgetary strategy and the injuries of which the plaintiffs complained. When the evidence was viewed in the light most favorable to the plaintiffs, it was reasonably foreseeable that the " 'survival mode' " budgetary cuts the parent corporation required the subsidiary to make (*id.* at 305-06) had to come out of "staffing, safety, maintenance, and training" (*id.* at 291), which were the only areas that could have been cut (*id.* at 295), and because the oil-refining industry "inherently involve[d] a great amount of danger," it likewise was reasonably foreseeable that cutbacks in those areas would lead to the injury of employees (*id*. at 291). And, in fact, that is what happened: the plaintiffs' decedents were burned to death when other, apparently poorly trained, employees of the subsidiary attempted to replace a valve on a pipe without first making sure the pipe was depressurized. *Id.* at 278. Budget cuts led perhaps to less training, which in turn led to death.

¶ 118       In the present case, we do not see the causal connection between any budgetary decision by Chicago and North Western and the destruction of the school building. The wrongful act that caused the harm was the removal of naturally necessary subjacent support. The School District does not explain how the failure to leave enough coal pillars to support the ground surface had anything to do with Chicago and North Western's "overall business *** strategy" for Superior Coal. *Id.* at 290.

¶ 119       It is true that Chicago and North Western gave Superior Coal a mission: mine coal for Chicago and North Western's steam locomotives. In *Forsythe*, however, the parent was potentially liable as a direct participant not because the parent had required the subsidiary to

- 20 -

engage in the inherently dangerous oil-refining industry but because the parent had imposed a budgetary policy on the subsidiary that foreseeably enhanced the dangers of the oil-refining industry. Merely by requiring Superior Coal to mine coal, Chicago and North Western did not hinder or discourage Superior Coal from leaving adequate subjacent support, as far as we can see. Therefore, Union Pacific was entitled to a summary determination in its favor on the School District's theory of direct participation liability.

¶ 120                    C. Piercing the Corporate Veil

¶ 121                         1. *Not an Action,*
                    *But an Equitable Remedy in an Action*

¶ 122    In the event that Chicago and North Western did not expressly assume Superior Coal's liability for future subsidences (and we have held that Union Pacific is entitled to a summary determination that Chicago and North Western did not do so), plaintiffs seek to pierce Superior Coal's corporate veil and to impose liability on Chicago and North Western (and, ultimately, on Union Pacific).

¶ 123    Piercing the veil is not, in itself, an *action*. Rather, it is an equitable remedy in an action against an ostensible corporation–for example, a tort action or an action for breach of contract. *Gass v. Anna Hospital Corp.*, 392 Ill. App. 3d 179, 185 (2009). The veil is the metaphorical equivalent of the corporate form, and in some circumstances, fairness might move a court to pierce the veil and to impose liability on the actor behind the veil, often the dominant shareholder.

¶ 124    The shareholder behind the veil need not be a natural person. It can be a parent corporation using a subsidiary as its instrumentality. "Generally, before the separate corporate identity of one corporation will be disregarded and treated as the alter ego of another, it must be shown that it is so controlled and its affairs so conducted that it is a mere instrumentality of another, *and* it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice." (Emphasis added.) *Main Bank of Chicago v. Baker*, 86 Ill. 2d 188, 205 (1981).

¶ 125        2. *The Difference Between Normal Participation as a Majority Shareholder*
                    *and Using the Subsidiary as an Instrumentality*

¶ 126    Chicago and North Western owned all of Superior Coal's stock except for five shares (which the directors of Superior Coal owned in order to be qualified to serve as directors). Also, the two corporations had common directors and officers. It is relevant to an instrumentality analysis that Chicago and North Western owned almost all of Superior Coal's stock and that the two corporations had common directors and officers (see *Hystro Products, Inc. v. MNP Corp.*, 18 F.3d 1384, 1389 (7th Cir. 1994)), but those facts are insufficient, by themselves, to make Superior Coal a mere instrumentality of Chicago and North Western (*Superior Coal I*, 377 Ill. at 289).

¶ 127    The very definition of a "parent corporation" is "[a] corporation that has a controlling interest in another corporation (called a *subsidiary corporation*), [usually] through ownership of more than one-half the voting stock." (Emphasis in original.) Black's Law Dictionary 344 (7th ed. 1999). Obviously, Superior Coal could not be regarded as the instrumentality of

Chicago and North Western merely because Chicago and North Western owned almost all of Superior Coal's stock. If, simply by owning a majority of the voting stock in a corporation, the stockholder reduced the corporation to an instrumentality, every subsidiary would be an instrumentality, lacking a genuine existence as a corporation in its own right. See *Logal v. Inland Steel Industries, Inc.*, 209 Ill. App. 3d 304, 310 (1991) ("To hold otherwise would render virtually every subsidiary the alter ego of its parent."); Eric J. Gouvin, *Resolving the Subsidiary Director's Dilemma*, 47 Hastings L.J. 287, 287-88 (1996) ("Holding companies dominate our economy. In 1995, the ten largest companies on the Fortune 500 owned an average of 62 subsidiaries each. Many subsidiary corporations, though owned entirely by another corporation, are themselves gigantic corporate enterprises. For example, Philip Morris, the tenth largest U.S. corporation, owns such major businesses as the Miller Brewing Company, Kraft Foods, and the Philip Morris tobacco manufacturing operating unit.").

¶ 128    "[B]y definition, a parent corporation is a corporation that has working control of the subsidiary corporation through stock ownership." *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 503 (2005). The parent exercises this control by voting its shares. As the majority shareholder, the parent effectively gets to decide who serves on the subsidiary's board of directors, because the parent will cast the most votes, corresponding to the number of shares it owns. No doubt the parent will choose directors sympathetic to its vision, and if they become unsympathetic, the parent will replace them. See Patrick L. Sealey, *An Alternative Approach to Diversity Jurisdiction for Corporations: Parent-Subsidiary Corporations*, 20 J. Corp. L. 497, 510 (1995) ("Even if a subsidiary has its own management team, it would be naive to expect the enterprise owners to remain silent if they disagree with the subsidiary's policies; if heads roll, there is no doubt whose heads they will be." (Internal quotation marks omitted.)).

¶ 129    When a parent exercises the power it has over a subsidiary by virtue of owning the majority of the voting shares, how do we know when the parent is just exercising "working control" over the subsidiary (*Fontana*, 362 Ill. App. 3d at 503), as it is only to be expected a parent will do, and how do we know when the parent is doing something more than that: using the subsidiary as its mere instrumentality (*Gass*, 392 Ill. App. 3d at 185). See Stephen B. Presser, *The Bogalusa Explosion, "Single Business Enterprise," "Alter Ego," and Other Errors: Academics, Economics, Democracy, and Shareholder Limited Liability: Back Towards a Unitary "Abuse" Theory of Piercing the Corporate Veil*, 100 Nw. U. L. Rev. 405, 415 (2006) ("Since shareholders or parents always will have the potential to control, or will be controlling their corporations, to apply *** [a] control test is to evaporate the protections of limited liability.").

¶ 130    The answer must lie in the different connotations of the terms "working control" and "mere instrumentality." "Instrumentality" means something more than "control." All corporations that are instrumentalities are under working control, but not all corporations under working control are instrumentalities. The proposition that a parent "controls" a subsidiary says nothing about the ends to which the parent exercises that control. By contrast, the proposition that a subsidiary is the "mere instrumentality" of the parent conveys not only the idea of control but control in the parent's interest as opposed to the subsidiary's interest. There is a difference between controlling a subsidiary in the subsidiary's interest and controlling it in the parent's interest. An "instrumentality" is "[a] means or agency through which a function of another entity is accomplished, such as a branch of a governing body."

Black's Law Dictionary 802 (7th ed. 1999). When a subsidiary is the "mere instrumentality" of its parent, the subsidiary's apparent mission is to accomplish the functions of its parent, such that the subsidiary's separate corporate form is superfluous and the subsidiary might as well be a branch or department of the parent.

¶ 131      The question might be asked, though: Why would anyone buy a majority stake in a company merely to have an opportunity for self-denial? "In the shareholders' minds, the function of the corporation is to serve and benefit its owners. Thus, they will cause it to act accordingly. It certainly seems nonsensical to suggest that shareholders should occasionally cause their corporations to act contrary to their interests so that the company will not be seen as their 'instrumentality.' " Kent Bickham Payne, *Piercing the Corporate Veil in Louisiana Absent Fraud or Deceit*, 48 La. L. Rev. 1229, 1238 (1988). In other words, shares are private property. Cannot shareholders vote them however they desire? Is it not only to be expected that the parent, like any other majority shareholder, will act in its own best interest, even if that means acting against the best interest of the subsidiary?

¶ 132      Actually, if the subsidiary has minority shareholders, the parent has to think of them, too. The supreme court has held: "An action by a parent corporation injurious to its subsidiary is actionable as a breach of fiduciary duty." *In re Rehabilitation of Centaur Insurance Co.*, 158 Ill. 2d 166, 174 (1994). "[A] parent corporation generally owes a fiduciary duty to its majority-controlled subsidiary or to the minority shareholders of its subsidiary." 12B William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 5811.40, at 159 (2000). In its dealings with the subsidiary, the parent must be fair and must refrain from oppressing the minority. Harry G. Henn & John R. Alexander, Laws of Corporations and Other Business Enterprises § 240, at 654 (1983). See also 18 C.J.S. *Corporations* § 398, at 688 (2007) ("A parent corporation owes a fiduciary duty to its subsidiary when there are parent-subsidiary dealings, and transactions between a parent corporation and its subsidiary are subject to scrutiny for fraud, unfair dealing, or other inequitable conduct."); 18A Am. Jur. 2d *Corporations* § 674, at 503 (2004) ("In exercising its control and dominion over a subsidiary, the parent corporation is a fiduciary, invoking the requirement of fairness in its dealings with such subsidiary."); *cf. United States v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 691 (5th Cir. 1985) ("Where the subsidiary is wholly-owned by the parent and has the same directors and officers, operating the subsidiary independently of the parent company not only has little practical meaning, it would also constitute a breach both of the subsidiary's duty to further the interests of its owner, and of the directors' and officers' duty towards the parent company.").

¶ 133      It appears that Superior Coal had minority shareholders, namely, its directors–a tiny minority, but a minority, nevertheless. Therefore, when making decisions for Superior Coal, each of the directors on Superior Coal's board owed a fiduciary duty not only to Chicago and North Western as the majority shareholder but also to the other directors as minority shareholders. Instead of "favor[ing] one intracorporate group to the detriment of another," the directors of Superior Coal "owe[d] fiduciary duties to the corporation to exercise unbiased judgment in the best interests of the corporation as a whole." Henn, *supra*, § 240, at 652. Therefore, it was *not* only to be expected that Superior Coal, having minority shareholders, would be the mere instrumentality of Chicago and North Western, the majority shareholder. (The instrumentality doctrine might be problematic in the case of a *wholly owned* subsidiary, considering that, in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771

(1984), the Supreme Court said: "A parent and its wholly owned subsidiary have a complete unity of interest. *** [T]heir general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver." *Cf. Gajda v. Steel Solutions Firm, Inc.*, 2015 IL App (1st) 142219, ¶ 23 ("Courts are reluctant to pierce the corporate veil and will only do so when (1) there is such a unity of interest and ownership that the separate personalities of the corporations no longer exist and (2) circumstances exist so that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable circumstances." (Internal quotation marks omitted.)). Perhaps, in the case of a wholly owned subsidiary, the test is reduced to (2).)

¶ 134    Generally, when a subsidiary operates as the mere instrumentality of its parent, the two corporations have common directors and officers (*Fontana*, 362 Ill. App. 3d at 502), and when ostensibly acting as directors and officers of the subsidiary, these persons really have on their hats as directors and officers of the parent (see *Gass*, 392 Ill. App. 3d at 185). The people of the state, through their democratically elected representatives, have chosen to bestow corporate personhood on certain conditions, including the condition that the directors of the corporation serve the corporation (see 1903 Ill. Laws 125). When, in reality, the directors' allegiance and loyalty are to the majority shareholder instead of to the corporation, the democratic will is subverted in a duplicitous way. The Supreme Court has said: "[D]irectors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership. [Citations.] *** [C]ourts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary ***." (Internal quotation marks omitted.) *United States v. Bestfoods*, 524 U.S. 51, 69-70 (1998). In a footnote, the Supreme Court added: "Here, it is prudent to say only that the presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent." *Id.* at 70 n.13. See also *Forsythe*, 224 Ill. 2d at 292-93 (quoting those passages from *Bestfoods*, 524 U.S. at 69, 70 n.13).

¶ 135    Thus, it is not "consistent with norms of corporate behavior" for dual directors and officers, when they are acting purportedly on behalf of the subsidiary, to take actions "plainly contrary to the interests of the subsidiary [and] yet nonetheless advantageous to the parent." (Internal quotation marks omitted.) *Id.* at 293. (Again, the rule might be otherwise in the case of a wholly owned subsidiary.) When that happens, the subsidiary has been reduced to a mere instrumentality of the parent. While transacting the subsidiary's business, the dual directors and officers really are taking their orders from on high, or their loyalties are pointed in that direction, and they act in the parent's interest. See *Baker v. Raymond International, Inc.*, 656 F.2d 173, 180 (5th Cir. 1981) ("[w]hether the directors and officers of [the subsidiary] act independently in the interest of that company, or whether they take their orders from the [parent] and act in the [parent's] interest"); Eric J. Gouvin, *Resolving the Subsidiary Director's Dilemma*, 47 Hastings L.J. 287, 300 (1996) ("For most board decisions, therefore, the default rule appears to be that the directors owe their duties to the corporation as an entity. Although assessing the corporation's interests necessarily requires

evaluation of shareholder interests, directors ordinarily do not owe their primary duty to the shareholders."); Brian Winrow, *Director Liability: A Cliché in North Dakota*, 84 N.D. L. Rev. 1109, 1134 (2008) ("Directors help establish the independence between the corporation and the shareholder."). The cases speak of a "unity of interest": not just a unity of ownership but a "unity of interest." *South Side Bank v. T.S.B. Corp.*, 94 Ill. App. 3d 1006, 1009 (1981). It is as if the subsidiary has no interest of its own but exists primarily to serve the interests of the parent, so that, substantially, there is no difference between the subsidiary and a department of the parent. Formalistically, there might be a difference–the corporate rituals might be scrupulously observed–but substantially, in the underlying decisions ornamented by these corporate rituals, the subsidiary primarily serves the parent.

¶ 136            3. *Factors, Many of Which Are More Relevant to the Question of*
                 *Corporate Neglect Than to the Question of Instrumentality*

¶ 137    Union Pacific says that "[t]o establish the first element of a veil-piercing claim"–namely, that the subsidiary is the mere instrumentality of the parent–"certain factors are critical," and Union Pacific lists 10 factors:

> "(1) inadequate capitalization[,] (2) failure to issue stock[,] (3) failure to observe corporate formalities[,] (4) nonpayment of dividends[,] (5) insolvency of the debtor corporation[,] (6) non-functioning of officers or directors[,] (7) absence of corporate records[,] (9) diversion of assets from the corporation by or to a shareholder[,] and (10) the failure to maintain an arm's-length relationship among related entities."

Actually, none of the cases that Union Pacific cites–*Main Bank*; *Cosgrove Distributors, Inc. v. Haff*, 343 Ill. App. 3d 426 (2003); and *Logal v. Inland Steel Industries, Inc.*, 209 Ill. App. 3d 304 (1991)–says that all the factors are "critical." Indeed, when the question is whether a subsidiary is the mere instrumentality of the parent, few of the factors even make sense.

¶ 138                         a. Inadequate Capitalization

¶ 139    Union Pacific points out that, 112 years ago, in 1903, Chicago and North Western made a capital investment of $1.5 million in Superior Coal. See David Millon, *Piercing the Corporate Veil, Financial Responsibility, and the Limits of Limited Liability*, 56 Emory L.J. 1305, 1337 (2007) ("When courts speak of undercapitalization, typically the reference is to the amount of capital contributed to the venture when it is launched."). It is unclear what this capital investment has to do with the question of whether Chicago and North Western used Superior Coal as its mere instrumentality during the succeeding half century.

¶ 140    Inadequate capitalization would be relevant if Superior Coal still existed and plaintiffs sued it only to learn that it lacked any assets to collect from. "The consideration of whether a corporation is adequately capitalized is based on the policy that shareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for the corporation's prospective liabilities. [Citation.] It is inequitable to allow shareholders to set up a flimsy organization just to escape personal liability." *Fontana*, 362 Ill. App. 3d at 504. Plaintiffs are not claiming, however, that Chicago and North Western set up Superior Coal as a flimsy, undercapitalized organization so that when an injured party sued Superior Coal in lieu of Chicago and North Western, Superior Coal would be judgment-proof. Instead, plaintiffs are claiming that Chicago and North Western set up Superior Coal as a plausible

organization, with the trappings, bureaucracy, and assets of a real corporation, only to use Superior Coal as its mere instrumentality.

¶ 141 Undercapitalized, Superior Coal would not have been of much use as an instrumentality. To be the coal-mining tool of Chicago and North Western, Superior Coal had to have employees, equipment, and mineral rights–all of which required a capital investment.

¶ 142 b. Failure to Issue Stock

¶ 143 The appellate court has said that when deciding whether a subsidiary is the mere instrumentality of its parent, a court should consider, among other factors, the "failure to issue stock," apparently meaning that if the subsidiary had issued stock, that fact would go against an instrumentality theory. (Internal quotation marks omitted.) *Gass*, 392 Ill. App. 3d at 186.

¶ 144 This is another factor that makes absolutely no sense in an instrumentality case. "Stock control *** [is] generally [a] *prerequisite*" to an instrumentality theory. (Emphasis added.) *Hystro*, 18 F.3d at 1389. By the power that majority stock ownership confers, the parent makes the subsidiary its instrumentality. Obviously, the parent would not be able to do that–and would not even be a parent–unless the subsidiary had issued stock.

¶ 145 c. Failure to Observe Corporate Formalities

¶ 146 A court might pierce the corporate veil because of a "failure to observe corporate formalities." *Gallagher v. Reconco Builders, Inc.*, 91 Ill. App. 3d 999, 1005 (1980). Often, the reason given for this factor is as follows: "[O]ne may view incorporation as a privilege conferred by the State, rather than as an ordinary incident of doing business. Since the State, by statute, authorizes the creation of a corporation and, pursuant to the same statute, sets forth certain rules for its operation, observance of such rules is a condition precedent to the benefit of limited liability." 7 Charles W. Murdock, Illinois Practice § 8:17 (2d ed. 2015).

¶ 147 Observance of the corporate formalities, however, is only one condition precedent to limited liability. In the case of a subsidiary with minority shareholders, another condition precedent is having officers and directors who use these corporate formalities to conduct the subsidiary's business rather than the parent's business. *Fontana*, 362 Ill. App. 3d at 500. "[W]here corporate formalities are substantially observed *and* the parent does not dominate the subsidiary, a parent and subsidiary are two separate entities[,] and the acts of one cannot be attributed to the other." (Emphasis added.) *Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 944 (7th Cir. 2000).

¶ 148 d. Nonpayment of Dividends

¶ 149 Another factor that routinely shows up in the list is the nonpayment of dividends, the implication apparently being that if the subsidiary has paid dividends, it is less likely to be a mere instrumentality of the parent. *Gass*, 392 Ill. App. 3d at 186.

¶ 150 Actually, dividends are a two-edged sword. On the one hand, the argument could be made that if the subsidiary acquired the means to pay dividends, the parent must have allowed the subsidiary to act in its own self-interest and to make a profit. On the other hand, when the subsidiary consistently pays hefty dividends to the parent, those amounts enrich the

parent instead of getting plowed back into the subsidiary. The parent, as the majority shareholder, would not necessarily be averse to getting paid dividends by its instrumentality.

### e. Insolvency of the Debtor Corporation

That the subsidiary is insolvent *can* be a sign that the subsidiary is a mere instrumentality of the parent if the parent's policy is to exploit the subsidiary into oblivion. See *Henderson v. Rounds & Porter Lumber Co.*, 99 F. Supp. 376, 384 (W.D. Ark. 1951). Not every parent, however, would want to do that to its instrumentality. If the subsidiary is on the road to bankruptcy, it will not be a serviceable instrument for long. To be a useful and durable instrument, the subsidiary must be solvent.

If Superior Coal had gone down, it is questionable how much longer Chicago and North Western would have lasted, because it would have had to buy coal at commercial rates and pay to have it shipped. Evidently, Chicago and North Western could not even afford to pay Superior Coal the cost of production. See *Superior Coal I*, 377 Ill. at 286 ("[Chicago and North Western] has long been in bankruptcy ***."). To continue supplying coal to Chicago and North Western without profit, Superior Coal had to receive enough funding to survive.

### f. Nonfunctioning of the Other Officers or Directors

The next factor is the "nonfunctioning of *the other* officers or directors." (Emphasis added.) "Other than whom?" the reader might wonder–until the reader realizes that this factor and, indeed, all the other factors in the list come ultimately from cases in which a corporation allegedly was the alter ego of an *individual*, a natural person. *Cosgrove*, 343 Ill. App. 3d at 429; *Fiumetto v. Garrett Enterprises, Inc.*, 321 Ill. App. 3d 946, 958-59 (2001); *Ted Harrison Oil Co. v. Dokka*, 247 Ill. App. 3d 791, 795 (1993); *Gallagher*, 91 Ill. App. 3d at 1005.

For instance, John Doe buys some online incorporation software, types in his name as president and director and types in the names of his Uncle Henry and Aunt Sally as other directors. Later, when Acme Corporation is sued, no board meetings have ever taken place, and the "other officers or directors," Uncle Henry and Aunt Sally, have never participated in the management of the corporation and, for that matter, are unsure what a director even does. It is as if Acme Corporation had no formal existence beyond the certificate of incorporation.

By contrast, in a case in which a subsidiary serves as the instrumentality of a sophisticated parent, one would expect that, typically, the subsidiary will have a formal existence, maybe even an elaborate formal existence. "Since the parent/subsidiary situation is generally found in the context of larger corporations with more sophisticated counsel, there generally is not a problem with the corporate rituals." 7 Charles W. Murdock, Illinois Practice § 8:19 (2d ed. 2015). After all, there has to be *something* that functions as an instrumentality of the parent. A mere piece of paper, a certificate of incorporation, would not be much of an instrumentality. There has to be a corporate apparatus, something for the parent to dominate. Formally, all the parts of a subsidiary corporation are there, just as the Manchurian Candidate has all his body parts. But the will has been taken over. The directors of the subsidiary "function," in a manner of speaking. They attend board meetings and vote on corporate matters, but when doing so, they usually are working for the parent, at least when it comes to significant matters.

¶ 158　　　　　　　　　　　　　g. Absence of Corporate Records

¶ 159　　　Like the nonfunctioning of officers and directors, the absence of corporate records is "more probative of corporate neglect than intentional misuse of the entity." Jeffrey K. Vandervoot, *Piercing the Veil of Limited Liability Companies: The Need for a Better Standard*, 3 DePaul Bus. & Com. L.J. 51, 98 (2004). The gist of an instrumentality theory is not so much neglect of the corporate form as misuse of the corporate form by turning the subsidiary into the self-sacrificing lackey of the parent. Minutes, contracts, and other documents are generated by a corporate apparatus devoted almost exclusively to the parent's interest. In fact, generating corporate records is part of the instrumental function.

¶ 160　　　For example, a proposed contract is duly approved in the minutes of Superior Coal's board meeting, and the contract is duly signed by the respective officers of their companies, but the contract agrees to sell coal to Chicago and North Western at merely the cost of mining the coal–as if the transaction were nothing but the funding of a department, not a negotiation between two separate corporations, each of which is intent on maximizing its own profit.

¶ 161　　　　　　　　　　　　　h. Diversion of Assets

¶ 162　　　A "diversion of assets from the corporation by or to a shareholder" (*Cosgrove*, 343 Ill. App. 3d at 429) is an "unauthorized use" of corporate assets (Black's Law Dictionary 491 (7th ed. 1999) (definition of "diversion")). Again, this factor seems more relevant to the case of the unsophisticated individual shareholder who is neglectful of the corporate formalities.

¶ 163　　　For example, in *Miles v. CEC Homes, Inc.*, 753 P.2d 1021, 1022 (Wyo. 1988) (cited in *In re Estate of Wallen*, 262 Ill. App. 3d 61, 69 (1994)), Maurice Miles owned a corporation, Meadowbrook Development, Inc. (Meadowbrook), which was in the business of building houses. The trial court pierced the corporate veil and held Miles liable for Meadowbrook's debt. *Miles*, 753 P.2d at 1022-23.

¶ 164　　　One of the reasons why the Supreme Court of Wyoming upheld that decision was "the diversion of assets from [the] corporation by or to [the] stockholder ***, to the detriment of creditors." (Internal quotation marks omitted.) *Id.* at 1024. Meadowbrook had built storage units and a retail office building for Miles personally, all "without profit." *Id.* Meadowbrook also had built a garage on Miles's property, and there was no record that Miles ever paid Meadowbrook for the labor, materials, and other expenses. *Id.* Miles even gave away a corporate dump truck in exchange for snow plowing services at his personal residence. *Id.*

¶ 165　　　Typically, in an instrumentality case, one would not expect a large parent corporation to resort to such crude, undocumented "diversions" of the subsidiary's assets. That would be unnecessary. That would be highly irregular. Instead, the subsidiary, as the parent's instrumentality, would pass resolutions to put up collateral for the parent's loans or to sell its merchandise to the parent at cost or to pay dividends to the parent that exceed the subsidiary's net income. Instruments would be drafted accordingly. Memoranda would be signed. All the i's would be dotted, and all the t's would be crossed. The exploitation of the subsidiary would be duly and meticulously self-authorized.

¶ 166　　　　　　　　　i. Failure to Maintain an Arm's-Length Relationship

¶ 167 The final factor in the list is the "failure to maintain [an] arm's-length relationship[ ]" among related entities." *Cosgrove*, 343 Ill. App. 3d at 429. This factor is a little hard to understand in the case of a parent and a subsidiary because "arm's length" means "[o]f or relating to dealings between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power." Black's Law Dictionary 103 (7th ed. 1999). A parent and its subsidiary are related corporations, and it would be naive to suppose they have roughly equal bargaining power. The parent may replace the directors and even dissolve the subsidiary.

¶ 168 A more apt question is the one posed by a factor that Union Pacific has omitted from the list: "whether the corporation [was] a mere facade for the operation of the dominant shareholder[ ]." *Cosgrove*, 343 Ill. App. 3d at 429.

¶ 169 Superior Coal was a coal-mining company, and from 1903 to 1947, in an age of steam-powered locomotives and coal-heated homes, Chicago and North Western was its only customer. Superior Coal "[sold] the entire output of its mines, except inconsequential sales to its own employees for their person use, to the parent corporation." *Superior Coal I*, 377 Ill. at 283. Except for some "limited amounts" Superior Coal received from royalties, rents, and investments, Chicago and North Western was its only source of income. *Id.* at 285. See *Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157, 161 (7th Cir. 1963) (One of the factors suggestive of instrumentality is that "[t]he subsidiary has substantially no business except with the parent corporation." (Internal quotation marks omitted.)).

¶ 170 It appears that, from the early 1930s onward, Superior Coal charged Chicago and North Western, its sole customer, only the cost of production. That effectively was true even from July 1932 to December 1934, when Superior Coal was charging Chicago and North Western 20 cents per ton in excess of Superior Coal's cost of production, because by prior agreement Superior Coal turned around and paid that excess to Chicago and North Western's creditor, the Reconstruction Finance Corporation. In December 1934, Superior Coal resumed charging Chicago and North Western only the cost of production.

¶ 171 The contract of December 27, 1934, recited: "[F]or many years said Coal Company has, although constituting a separate corporation, been managed and operated, and its properties managed and operated, as a branch or department of said Railway Company, and wholly in its interest ***." See *id.* ("In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation ***." (Internal quotation marks omitted.)). Superior Coal told the supreme court the same thing in *Superior Coal I*, 377 Ill. at 283-84.

¶ 172 Union Pacific dismisses these representations as rhetorical and conclusory. That Superior Coal was an instrumentality of Chicago and North Western is indeed a conclusion of fact, but it is unclear why Superior Coal and Chicago and North Western would feel the need to wax rhetorical in a private contract between themselves. If A says of B, "He is nothing but a yes-man for C," the statement could be shrugged off as rhetorical and conclusory unless A offered evidence to back it up. If B, however, solemnly says of himself, "I'm nothing but a yes-man for C," and if C solemnly agrees, the statement is not so easily dismissed, because, arguably, no one knows better than B and C themselves whether B is a yes-man for C. See *Steven*, 324 F.2d at 161 ("In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation ***." (Internal quotation marks omitted.)).

- 29 -

¶ 173    But the evidence does not point all one way. Some things could be said against the instrumentality theory. In the tax case, Superior Coal had an incentive to exaggerate its servility, to get out of paying the retailers' occupation tax. Apparently, Superior Coal exercised some freedom to make decisions in its own interest. Throughout its existence, Superior Coal paid dividends, which, arguably, suggests enough autonomy to make a profit. It leased out properties to third parties. When investing in Chicago and North Western, the board of Superior Coal instructed its agents to buy securities and bonds at the "best prices obtainable." From 1947 onward, Superior Coal sold coal to other customers, and Chicago and North Western no longer consumed 100% of its production. Superior Coal found salvage buyers for its physical assets. It is not for us, but it is for the trial court, to determine the weight to give these competing items of evidence. See *Destiny Health, Inc. v. Connecticut General Life Insurance Co.*, 2015 IL App (1st) 142530, ¶ 22. Therefore, we reverse the summary determination in favor of Union Pacific on the instrumentality issue, and we remand this case for an evidentiary hearing on that issue.

¶ 174    Until the trial court, sitting in equity, resolves the factual question of whether Superior Coal was indeed a mere instrumentality of Chicago and North Western, the legal question of whether justice requires a piercing of the corporate veil is premature.

¶ 175                                        4. *Superior Coal I*

¶ 176    Union Pacific argues that even though, in *Superior Coal I*, Superior Coal insisted to the supreme court that it was merely a "department," "branch," "agent," or "instrumentality" of Chicago and North Western (*Superior Coal I*, 377 Ill. at 283-84), the supreme court was unconvinced and said: "[T]he separate corporate existence of the two companies has been established and long preserved in the present case, and each corporation has obviously secured substantial economic benefits from its separate existence." *Id.* at 291.

¶ 177    Read in isolation, that sentence does indeed appear to suggest that Superior Coal was a *bona fide* corporation, separate and distinct from its parent, Chicago and North Western. In context, though, "the separate corporate existence of the two companies," "established and long preserved" (*id.*), meant only the "utiliz[ation of] separate corporate *forms* for nearly forty years," including "the legal *habiliments*" (that is, the clothing) "incident to a sale in the transactions involved in this litigation" (emphases added) (*id.* at 295). For purposes of the retailers' occupation tax, nothing else mattered but these corporate forms and the legal habiliments of sales. The supreme court was indifferent to the question of what will was animating Superior Coal's corporate form. Superior Coal could candidly admit that, in reality, it was merely an "agent or instrumentality" of its parent, Chicago and North Western (*id.* at 283-84), but all the supreme court cared about was whether Chicago and North Western and Superior Coal had been going through the *motions* of being separate corporations, including the execution of what purported to be contracts for the sale of coal. After "observ[ing] the *formalities* incident to separate corporate existence and receiv[ing] substantial economic benefits therefrom" (emphasis added) (*id.* at 290), the purported corporation, Superior Coal, could not pierce its corporate veil for its own benefit, "for the purpose of avoiding the burdens likewise incident to the maintenance of separate corporate identities" (*id.*)–even if the "corporate entity" was indeed a "fiction," as the supreme court seemed to grant in its statement of the issue (*id.* at 289).

¶ 178    The contracts for the sale of coal at no more than production cost might well have been, in reality, "interdepartmental transfer[s]," as Superior Coal claimed (*id.* at 283-84), but the "legal habiliments" of sales between two "corporate forms" were enough to trigger liability for the retailers' occupation tax (*id.* at 295). If the contracts were fake, Superior Coal had faked its way into taxation. That was what the supreme court was getting at, as it later made clear in *Superior Coal Co. v. Department of Revenue*, 4 Ill. 2d 459, 463 (1954) (*Superior Coal II*): "We *** held [in *Superior Coal I*] that the facts and circumstances did not warrant the disregarding of the *fiction* of the corporate entity." (Emphasis added.) So, granting that Superior Coal's separate corporate existence was a "fiction" as Superior Coal claimed, the fiction nevertheless would be observed because, under the circumstances, justice did not demand its nonobservance.

¶ 179    Recall that just because a subsidiary is the mere instrumentality of the parent and, as such, a "fictional" corporation, that is not enough to warrant piercing the corporate veil. *Dregne v. Five Cent Cab Co.*, 381 Ill. 594, 603 (1943). There is an additional requirement: piercing the corporate veil must be necessary to thwart injustice or bad faith. *Id.* at 604. In *Superior Coal I*, piercing the corporate veil would have enabled bad faith rather than thwarted it.

¶ 180                                    D. Affirmative Defenses

¶ 181                              1. *Affirmative Defense No. 3:*
              *the School Building as the Proximate Cause of the Subsidence*

¶ 182    Union Pacific argues the trial court erred by making a summary determination in plaintiffs' favor on Union Pacific's amended third affirmative defense. That affirmative defense was as follows: "[T]he alleged mine subsidence would not have occurred but for the placement of the school on the site, [which] *** thereby became the immediate and/or sole proximate cause of such occurrence ***."

¶ 183    Union Pacific thereby pleaded a defense the supreme court recognized in *Wilms*. The supreme court held: "The act of removing all support from the superincumbent soil is, *prima facie*, the cause of its subsequently subsiding, but if the subsiding is, in fact, caused by the weight of buildings erected subsequent to the execution of the lease of the mine [by the previous owner of the land], this is in the nature of contributive negligence, and may be proved in defence." *Wilms*, 94 Ill. at 469. In other words, "this obligation to protect the superincumbent soil only extends to the soil in its natural state, and *** no obligation rests on the owner of the subjacent strata to support additional buildings, in the absence of express stipulation to that effect." *Id.* at 468. The mine operator must leave "*naturally necessary subjacent support.*" (Emphasis added.) Restatement (Second) of Torts § 820(1), at 78 (1979).

¶ 184    As Powell explains, the weight of the building generally is trivial compared to the weight of the superincumbent soil, and proving that the building caused the subsidence could be like proving the addition of a straw caused the camel to collapse:

              "Strict liability extends only to that support required by the land itself, and does not include additional support needed because of artificial structures. However, this distinction has little real significance in the law of subjacent support because the weight of artificial additions is generally slight compared with the weight of the fallen

supported land. Thus, some courts have held that if one withdraws subjacent support for the land of another, and subsidence would have occurred even in the absence of any artificial additions to the land, then the actor is strictly liable for harm to both the land and the structures. Moreover, the party removing subjacent support has the burden of proving that the subsidence would not have occurred but for the additional structures." 9 Richard R. Powell, Powell on Real Property § 63.06(1), at 63-28 to 63-29 (Michael Allan Wolf ed., 2000).

¶ 185    Union Pacific's own expert, Newman, testified that the 2009 "subsidence would have occurred irrespective of what was on the surface" of the School District's property. Robert D. Gibson, supervisor of the emergency section of the Illinois Department of Natural Resources Office of Mines and Minerals Abandoned Mined Lands Division, agreed that the weight of the building had nothing to do with the subsidence. The weight of the building, he testified, was "insignificant" compared to the weight of "all the rock and soils and stuff" above the mine, and the land would have subsided with nothing on the surface. It appears that no expert contradicted Newman and Gibson in that respect. Therefore, we find no genuine issue of fact as to Union Pacific's amended third affirmative defense, which alleged that the "mine subsidence would not have occurred but for the placement of the school on the site," and the trial court was correct to make a summary determination in plaintiffs' favor on that affirmative defense.

¶ 186                          2. *Affirmative Defense Nos. 6 and 9:*
                          *Comparative Fault and Assumption of Risk*

¶ 187    In its sixth affirmative defense, Union Pacific alleged as follows:

"(a) The School District knew or should have known of the risk of mine subsidence, but it and/or its agents failed to take proper care in the design, construction, maintenance, or use of the school.

(b) The School District knowingly and voluntarily assumed the risk of mine subsidence.

(c) The School District knew of the risk of mine subsidence, but it and/or its agents failed to take proper care in selecting a site for the school.

(d) The School District knew of the risk of mine subsidence and impermissibly counted on using the owner of the mineral rights as an insurer of last resort should subsidence occur, but did not give notice to the owner of the mineral rights as to the plans for new construction or consult as to possible methods to abate the risk of future subsidence.

If judgment is rendered in the School District's favor, such judgment must be reduced in amount or barred under the Illinois doctrine of *comparative fault*." (Emphasis added.)

¶ 188    In its ninth affirmative defense, Union Pacific alleged as follows:

"(a) The School District knew of the risk of mine subsidence but it knowingly and voluntarily built on the site anyway.

(b) The School District knew of the risk of mine subsidence, built on the site anyway, and it and/or its agents declined to take necessary precautions in the design,

- 32 -

construction, maintenance, or use of the school to reduce or eliminate the risk of subsidence.

If judgment is rendered in Plaintiff's favor, such judgment must be reduced in amount or barred under the Illinois doctrine of *assumption of risk*." (Emphasis added.)

¶ 189 Union Pacific makes essentially two arguments in support of its sixth and ninth affirmative defenses. First, Union Pacific points out that in *Wilms*, 94 Ill. at 469, the supreme court recognized "contributive negligence" as a defense in an action for mine subsidence. Second, Union Pacific reasons that because comparative fault is a defense to strict product liability (see *Coney v. J.L.G. Industries, Inc.*, 97 Ill. 2d 104, 119 (1983)), it likewise should be a defense to strict liability for mine subsidences.

¶ 190 The School District responds that in *Wilms*, 94 Ill. at 469, the supreme court stated that the causation of the subsidence by the weight of the buildings was "*in the nature of* contributive negligence," which was not the same as saying it *was* contributive negligence. (Emphasis added.) As for Union Pacific's other argument–that cases recognize comparative fault as a defense to strict products liability–the School District draws a distinction between "strict liability" and "absolute liability," arguing that the operator of a mine is *absolutely* liable for mine subsidences, not *strictly* liable. "This right of support is *absolute* and without condition ***." (Emphasis added.) *Lloyd v. Catlin Coal Co.*, 210 Ill. 460, 468 (1904). A "coal company's liability depends not on fault but arises from its *absolute* duty to provide the surface with support." (Emphasis added.) *Tankersley v. Peabody Coal Co.*, 31 Ill. 2d 496, 502 (1964). Cases after *Lloyd* and *Tankersley* have drawn a distinction between "strict liability" and "absolute liability." *Korando v. Uniroyal Goodrich Tire Co.*, 159 Ill. 2d 335, 343 (1994) ("Strict products liability is not a doctrine of absolute liability; the manufacturer of a product is not an absolute insurer."); *Prince v. Galis Manufacturing Co.*, 58 Ill. App. 3d 1056, 1060 (1978).

¶ 191 We will address those arguments and counterarguments in turn.

¶ 192                                   a. "Contributive Negligence"

¶ 193 The supreme court said in *Wilms*, 94 Ill. at 469: "The act of removing all support from the superincumbent soil is, *prima facie*, the cause of its subsequently subsiding, but if the subsiding is, in fact, caused by the weight of buildings erected subsequent to the execution of the lease of the mine, this is *in the nature of contributive negligence*, and may be proved in defence." (Emphasis added.) Contributive negligence (or contributory negligence) barred recovery in a tort case. *Willard v. Swansen*, 126 Ill. 381, 384-85 (1888).

¶ 194 For two reasons, the supreme court could not have meant in *Wilms* that "contributive negligence," strictly speaking, was a defense in an action for mine subsidence. *Wilms*, 94 Ill. at 469. First, even if a predecessor already had erected a building when the plaintiff acquired the land, the plaintiff, though himself innocent of any negligence, still would have been barred from recovery if it was the weight of the building that caused the land to subside. Second, under the doctrine of contributive negligence, the plaintiff had the burden of proving his or her own lack of contributive negligence (*Broadbent v. Chicago & Grand Trunk Ry. Co.*, 64 Ill. App. 231, 233 (1896)), whereas, according to *Wilms*, 94 Ill. at 469, the mine operator had the burden of proving that the weight of the building had caused the subsidence.

- 33 -

¶ 195    A building cannot be contributorily negligent, and that probably is why the supreme court used the phrase "in the nature of contributive negligence." *Wilms*, 94 Ill. at 469. It is one thing to say that something *is* contributive negligence, and it is another thing to say that something is "in the nature of" contributive negligence. The phrase "in the nature of" means "similar in type to or having the characteristics of." The New Oxford American Dictionary 1140 (2001). In *Wilms*, 94 Ill. at 469, the supreme court did not mean that the causal weight of the buildings *was* contributive negligence. Instead, the supreme court meant it was similar to contributive negligence in that, if the weight of the building caused the land to subside, recovery was barred. The weight of the building was relevant only to proximate cause, not contributory negligence, properly speaking.

¶ 196    In any event, in *Alvis v. Ribar*, 85 Ill. 2d 1, 27-28 (1981), the supreme court abolished the doctrine of contributory negligence and replaced it with the doctrine of pure comparative negligence, which reduced the plaintiff's recovery by whatever percentage the plaintiff was negligent. If, for example, a trier of fact found that both the plaintiff and the defendant had negligently caused the harm and that the plaintiff was 90% negligent compared to the defendant's 10% negligence, the plaintiff would recover only 10% of the damages the plaintiff had incurred. *Id.* at 25-26.

¶ 197    Later, in 1986, the legislature passed section 2-1116 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, ¶ 2-1116), which established a rule of modified comparative fault. Under that rule, the plaintiff would be barred from any recovery if the plaintiff's fault was more than 50% of the cause of the injury, whereas if the plaintiff's fault was 50% or less, the plaintiff's recovery would merely be reduced by that percentage. Section 2-1116 provided as follows:

> "In all actions on account of bodily injury or death or physical damage to property, based on negligence, or product liability based on strict tort liability, the plaintiff shall be barred from recovering damages if the trier of fact finds that the contributory fault on the part of the plaintiff is more than 50% of the proximate cause of the injury or damage for which recovery is sought. The plaintiff shall not be barred from recovering damages if the trier of fact finds that the contributory fault on the part of the plaintiff is not more than 50% of the proximate cause of the injury or damage for which recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of fault attributable to the plaintiff." *Id.*

(Public Act 89-7 (Pub. Act 89-7, § 15 (eff. Mar. 9, 1995)) rewrote section 2-1116. In *Best v. Taylor Machine Works*, 179 Ill. 2d 367 (1997), however, the supreme court held Public Act 89-7 to be unconstitutional in its entirety, with the result that the 1986 version of section 2-1116 returned to force.)

¶ 198                              b. "Absolute Liability" and "Strict Liability"

¶ 199    The School District draws a distinction between "absolute liability" and "strict liability." "Absolute liability" can mean different things, depending on the context in which the term is used. Sometimes it means a perfected liability as opposed to a contingent liability. *Howard v. Swift*, 356 Ill. 80, 85 (1934); *Scholbe v. Schuchardt*, 292 Ill. 529, 534 (1920). Sometimes it means liability even in the absence of negligence on the defendant's part (*Whitney & Starrett Co. v. O'Rourke*, 172 Ill. 177, 184-85 (1898); *Ciuferi v. Bullock Mining Co.*, 332 Ill. App. 1, 11 (1947)): a synonym for "strict liability." Black's Law Dictionary 925 (7th ed. 1999). In

products liability cases, "absolute liability" can mean, pejoratively, an extreme, unreasonable liability to which a manufacturer is *not* subject, namely, being "an absolute insurer of [the] product as to all injuries resulting from contact with or use of the product" (*Prince*, 58 Ill. App. 3d at 1060), regardless of whether "the injury or damage resulted from a condition of the product manufactured by the defendant, \*\*\* the condition was an unreasonably dangerous one, and \*\*\* the condition existed at the time the product left the manufacturer's control" (*Korando*, 159 Ill. 2d at 343).

¶ 200    When imposing an "absolute" duty on a mining operator to provide naturally necessary subjacent support, *Tankersley* and *Lloyd* did not intend to make the mining operator an unconditional insurer against subsidences, regardless of what had caused the subsidences. By making the mine operator an insurer, *Tankersley* and *Lloyd* would have abandoned the rule in *Wilms*, a case which *Tankersley* and *Lloyd* cited with apparent approval. *Tankersley*, 31 Ill. 2d at 502; *Lloyd*, 210 Ill. at 468. Rather, when speaking of the "absolute" duty to support the surface estate, *Tankersley* and *Lloyd* meant that the mine operator was *strictly liable* for subsidences resulting from the mine operator's removal of naturally necessary subjacent support (*Tankersley*, 31 Ill. 2d at 502; *Lloyd*, 210 Ill. at 468), that is, the mine operator was liable regardless of "the degree of care that may [have been] used by [it] in the prosecution of its work" (*id.*). See Black's Law Dictionary 926 (7th ed. 1999) (defining "strict liability" as "[l]iability that does not depend on actual negligence or intent to harm, but that is based on the breach of an absolute duty to make something safe"); Restatement (Second) of Torts § 820 cmt. b, at 78 (1979).


¶ 201        c. The Incompatibility of Comparative Fault With Subsidence Law

¶ 202    Section 2-1116 recognizes comparative fault as a defense to only one kind of strict liability, "*product* liability based on strict tort liability," and to only one kind of property damage, "physical damage to property, based on *negligence*." (Emphases added.) Ill. Rev. Stat. 1987, ch. 110, ¶ 2-1116. The present case meets neither description.

¶ 203    Not only would a comparison of fault in the present case be unauthorized by section 2-1116, but it would be inconsistent with an essential principle of mine subsidence law. Fault in a subsidence case is either/or. The harm is the subsidence, and the subsidence is either the mine operator's fault or not the mine operator's fault. The options are digital, one or zero. Either the mine operator left enough subjacent support to hold up the land in its natural state, in which case the mine operator is blameless, or else the mine operator failed to do so, in which case the mine operator is entirely to blame.

¶ 204    Union Pacific is attempting to shift some of the blame onto the School District by arguing that because subsidence was occurring right across the street, a reasonable person would have perceived a high risk that the same lack of naturally necessary subjacent support existed on the School District's side of the street. To be comparatively negligent, though, the School District would have had to do something that contributed to "the proximate cause of the injury or damage for which recovery is sought." *Id.* The injury or damage is the subsidence. By building the school, the School District did not cause the subsidence. By filling the mine rooms with grout, the School District might have *prevented* the subsidence, but by omitting the grout, the School District did not *cause* the subsidence.

¶ 205    Granted, the damages would have been smaller (they would have been only to the land) if the School District had built elsewhere, but the duty to mitigate damages arises only after the

injury has occurred, not before. *Malanowski v. Jabamoni*, 332 Ill. App. 3d 8, 15 (2002); *Tsoukas v. Lapid*, 315 Ill. App. 3d 372, 377 (2000); *Brady v. McNamara*, 311 Ill. App. 3d 542, 547 (1999); *Grothen v. Marshall Field & Co.*, 253 Ill. App. 3d 122, 128 (1993); *TRW Title Insurance Co. v. Security Union Title Insurance Co.*, 887 F. Supp. 1029, 1030 (N.D. Ill. 1995).

¶ 206    We can understand the argument that one should not knowingly and perversely pile up damages. But the School District did not *know* that Superior Coal had failed to leave naturally necessary subjacent support beneath the particular site of construction. According to the law of strict products liability, to which Union Pacific draws an analogy, a plaintiff injured by a defective product did not assume the risk of the injury unless, at the time, the plaintiff actually was aware of the dangerous defect in the product. *Calderon v. Echo, Inc.*, 244 Ill. App. 3d 1085, 1091 (1993) ("[F]or assumption of risk to preclude recovery, plaintiff must be *aware* of the defect in *the* product ***." (Emphases added.)); *King v. American Food Equipment Co.*, 160 Ill. App. 3d 898, 908 (1987) ("[A] plaintiff assumes the risk of a defective product only if he is actually aware of the defective nature of the product ***.").

¶ 207    The School District "had the right to assume that the coal would be mined and removed in a lawful manner and that sufficient coal or supports would be left to support the surface." *Morris v. Saline County Coal Co.*, 211 Ill. App. 178, 184 (1918). It strikes us as implausible that by breaching its duty toward some landowners in a city, a coal mining company could effectively deprive all the other landowners in the city of the right to make that assumption, with the consequence that, thereafter, all these other landowners would have to "earn" the right to build on their own land by first performing an expensive subterranean investigation and, if necessary, grouting. Otherwise, if a subsidence occurred, they supposedly would be at "fault" for purposes of section 2-1116 (Ill. Rev. Stat. 1987, ch. 110, ¶ 2-1116). Such a rule effectively would shift to the owners of the surface estate the mine operator's duty to substitute artificial supports for the naturally necessary supports the mine operator has removed. See *Seitz v. Coal Valley Mining Co.*, 149 Ill. App. 85, 89-90 (1909). It seems implausible that the law would do that. Therefore, we affirm the summary determination in plaintiffs' favor on the sixth and ninth affirmative defenses.

¶ 208                                    III. CONCLUSION

¶ 209    For the foregoing reasons, we reverse the summary judgment in plaintiffs' favor, and we remand this case for further proceedings.

¶ 210    Reversed and remanded.

- 36 -